# CHARLESTON.

## STATE *v.* TUCKER.

Submitted September 4, 1902. Decided March 14, 1903.

1. CRIMINAL TRIAL—*Affidavit*—*Error.*

Where the record shows that "T. who stands indicted for felony, was this day set to the bar in custody of the jailer of W. County, thereupon the said prisoner for plea says he is not guilty as in the indictment against him is alleged and of this he puts himself upon the country, and the prosecuting attorney doth the like and issue is thereon joined," and on the 14th day of February the jury rendered a verdict of guilty on said plea, and on the 14th day of March following defendant moved the court to correct the record of the plea of not guilty entered January 30, and tendered affidavits of defendant, of defendant's counsel and others in support of the motion to show that the plea of not guilty was entered by defendant's attorney and not by him in person. *Held:* not error to refuse the filing of such affidavits. (p. 426).

2. BILL OF EXCEPTIONS.

    The office of a bill of exception is to call the attention of the court to some specific matter as to which error is claimed and when the exceptant relies upon the bill of exceptions he must show by means of it the error complained of clearly and affirmatively; and in order to have relief he must further show that such error was to his prejudice. (p. 429).

3. GRAND JURY—*Bill of Exceptions.*

    Where the record shows that on a certain day "V. gentleman, foreman, this day appointed by the court as such" (and fifteen others naming them) "were empaneled and sworn a grand jury of inquest, in and for the body of the county of W., and having been charged were sent to their room to consider of the business before them" and no irregularity in summoning or convening the grand jury is pointed out in a bill of exceptions it will be presumed that no such irregularity existed. (p. 429).

4. HOMICIDE—*Exhibit.*

    It is not error to exhibit to the jury on the trial of a homicide the deadly weapon or instrument with which the act was committee, the same being identified as the one used. (p. 434).

Writ of error and *supersedeas* to Circuit Court, Wood County.

Action by State of West Virginia against Thomas Tucker. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

N. II. Moss, JR., and ATTORNEY GENERAL, for defendant in error.

J. F. LAIRD, for plaintiff in error.

McWHORTER, PRESIDENT:

Thomas Tucker was convicted in the criminal court of Wood County upon indictment for the murder of Mary Beall, alias Mary Bell, alias Mary Helmick, on the ———— day of January, 1902. Defendant applied to the circuit court of Wood County for a writ of error, which was refused on the 16th day of May, 1902. He then applied to, and obtained from one of the judges of this Court, a writ of error and *supersedeas* to the execution of the judgment rendered by the said criminal court. In the course of the trial the defendant, by counsel, took seven separate bills

of exceptions to the rulings of the court. The first bill of exceptions sets out that after the jury had returned their verdict in the case the prisoner moved to set aside the verdict and grant him a new trial on the ground that the verdict was contrary to the law and the evidence, and on the further ground of after discoverd evidence, and filed in support of his motion the affidavits of J. L. Frankling, John Carter and W. A. Smith. The court overruled the motion, to which ruling the defendant excepted. J. L. Frankling, the first witness sworn in the case, says that when Tucker came home that evening the white woman, Mary Bell, was there waiting for the defendant. "She came at half past seven and waited there until a quarter after eight waiting for him to come home; and no sooner than he had been in he threw off his hat and pulled off one shoe to go to bed, and called to his ma to give him some tobacco; and this woman said 'come on and go with me up street,' and he didn't answer, and he started to make a cigarette, and he raised up and spoke to her and she never answered him; and she said, 'come on and go with me to the corner any how;' and he said, 'all right,' and went to the porch; and he said, 'it is raining too hard out there;' and she says, 'come on,' and he went back and they pitched into quarreling, and I could not understand what was said; and she says, 'come on' and he says, 'I will go with you to the corner if it will do you any good;' and she started off and says, 'come on and go up to the corner; I will make it all right; I will fix you.' Q. When did you first see him again. A. Well, in about twenty minutes after that he came back hollering, and he said, 'Ma, I am ready to die now; I have killed Mary Bell;' and she said, 'No, you haven't.' I got up then and started after an officer to manage him. I goes up street—Well, I started after an officer, and in going up it was very dark and raining, and I fell over this body, which I supposed was a body until I struck a match; so I undertook to light a match and see what it was, and I saw that there was something lying there, but I could not tell what it was; my match went out. Q. When you first struck the match what did you see? A. I thought it was a person. I goes to headquarters and an officer came down with me. He threw his light on the body." He and the officer then went to the house, and in answer to the question, "What occurred when you got to the house?" "Well I do not know what occurred; why

we just found Tom hollering as usual. The officer got in ahead of me and when I got in I saw he was full of blood. I did not know where it came from." Q. "When Tom first came home did you notice any blood on him." A. "He had a little blood on his hands and on his cuff." Q. "Did you notice anything in his hand?" A. "He had a razor." The razor was shown the witness and identified as being the same that the prisoner had. John Carter said he was attending church that night and was sent for and went up stairs where Tom Tucker was; that he was going through the room and Tom's step-father had Tom by the arm. He says, "Uncle Jack, I done it; I killed woman and want to die." I says, "No, you will not kill yourself." Mr. Tucker took hold of his arm. Then he repeated to me: "Give me my revolver, I want to kill myself;" and I says, "No, Tom, as you did not do yourself up while you was at it you can't do it now." And then they went for the doctor. He says, "Did you ever love a woman?" And I says, "No, never enough to kill her and kill myself." And then he says, "Well, I killed her for love, and want to kill myself." And it was all I could do to hold him. I staid there until the policeman came." W. A. Smith testified as follows: "Well on the night of the murder I was at the depot, B. & O. depot, at the 10:30 train. Q. What position do you occupy, if any? A. Lieutenant of police. I went ahead and met Mr. Franklin on the corner. I went ahead down to the corner of Sixth and Ann streets; just a few steps below the woman was lying there. I had a flash light in my pocket and I flashed it on her. Her throat was cut. I went ahead after Tom Tucker down to his father's house, and he was there walking the floor; and I went in and he was talking something about writing a letter to his brother. I says, "What is the trouble here, Tom." He says, "I killed her because I loved her." Mr. Carter was in there. I told him to take hold of him and make him sit down. He sat there a few minutes and wanted to see his mother. She said she didn't want to see him, the condition he was in. He wanted to send and get some beer. He wanted to send for some of his friends, the boys he had been running with. Some officers came around. I had them go and telephone for an undertaker and for a cab to take him away in. He did not look able to walk. I also had them to telephone for Dr. Keever, and Dr. Keever came in and

he said to take him to the county jail. Q. What was the matter with him? A. He had cut a gash in his throat. Q. Well, now, you say when you would not let him send for the beer it angered him? A. Yes sir; anything that we crossed him in he seemed to get angry and tried to tear loose from us. He further stated that "After we had started to jail with him we got round the corner about thirty steps I presume, he says, 'I killed her and I ought to go to hell for it.'" J. E. O'Neal, a city policeman, says: "I got orders from the night clerk to go down on Sixth street, that there was a woman killed. I got down and run right on the woman and seen her laying there on her back with her eyes open and her throat cut. I went down to Tucker's home and went in. As I went in, Tom says, "Hello, Jim," and shook hands with me. Q. Who did? A. Tom Tucker. Lieutenant told me to go and telephone for an undertaker and the coroner, and told me to take charge of ..

I went back down and took hold of Tom and got his coat on and took him to jail. Q. State whether or not the defendant exhibited any temper there that night? A. No; I do not know. Q. What was he doing? A. He said he wanted to see his mother and wanted to write a letter to his brother. I believe he did write some words to his brother. Every little bit he would say, "I want to see my mother," "I want to see my mother." We took him out and when we got up street he pulled his coat up this way (indicating). When we got around by Camp's house he says: "I will go to hell for this." I says, "How is that." He says, "I will go to hell for this. I ought to go for this." I told him to walk faster. He says, "I can run if you want me to." Q. Was he talking sensible? A. Oh, yes, he acted sensible. He acted like he was drunk. I could smell the whiskey on his breath. He was not boisterous or any ways dangerous or anything." Dr. W. S. Keever, coroner, states that he found the body of the woman on the pavement on Sixth street, Mr. O'Neal guarding the body; that he had information that the man who killed her was in the last house on Sixth street; that he went to the house; there was some gentlemen there with a lantern who went to show him the house, when he went in there were three men holding Tucker; that he asked Tucker why he killed this woman, he turned round and began to curse me. He did not make any reply about that. Landsittle was sitting on one side of

him and Ford had him by the collar. He was sitting in a chair. He climbed up into the bed and then they took him back and set him down in the chair again, and he wanted me to get out of there. Then I asked him what this woman's name was, and he said Mary Beall; and I said, Mary Beall who; and he said, that as all the name she had; and I asked him how to spell it and he said Mary Beal or double l. The chief of police asked me where to take him, and I said over to the county jail. I sent the police to get the knife that he cut her with. His father got the cover and gave it to me. I looked around on the floor and found the razor on the floor in Tucker's house. And after that, the same night, we had the inquest. Q. Over the murdered woman, did you? A. Yes sir. Q. Please state if she was dead when you saw her? A. Yes sir; she was dead. Q. State what wounds were on her. A. The razor entered her throat on the left side of her body. The man that used the razor had it in his right hand. I would say that the cut started from behind the left ear, extending clear around under the throat, up and to even with the right ear. Q. How deep was it? A. It cut her head nearly off to the back of the spine. The cut was as deep as from one ear to the other, right straight through. It cut both the carotid arteries, both jugular veins, cut the windpipe in two, cut the esophagus in two. Q. Let me ask you what you did with the razor and cover? A. I filed it in the circuit clerk's office of Wood County. Q. Look at this razor and state if that is the razor. A. Yes sir; that is the razor. We found, also, a letter upon the table. Q. You say they held an inquest? A. Yes sir. Q. Look at the envelope now shown you and state what that is. A. That is the testimony and coroner's verdict of the inquest held over the body of Mary Beal." John Tucker, the father (or step-father) of the defendant testified that Mary Bell came to his house the night of the killing, as she frequently came there of evenings; that she was very angry; that she was about half drunk and she was always drunk when he saw her; that she was there when Tom came home. "He was in a pretty bad condition, more than I ever seen him when he ever came home." "He looked like he was kind of drunk, crazy or something. He acted kind of funny." "The first time I ever saw him in that condition in my life." "His habits so long as I have known him, and I have known him ever since he was a

kid; he always had good habits and always worked for good people." Fanny Tucker, the mother of the prisoner, stated that Tom was eighteen years old the previous August; that Mary Bell looked to be about thirty-five years old, may be older; that she "Was a kind of a bad woman, she drank a great deal and come to the house drunk, and I got her away from the house as easy as possible." "She was coming after that boy. I told her that I had no boy for her;" that she came about every other night; she would come around and ask for the boy. The testimony of J. W. Mather, who was in the jewelry business, was that he had Tom in his employ, as porter for over three years; that he had been "A good boy, an exceptionally good boy;" and stated, "He has had every opportunity to be otherwise in my place, but I found him trustworthy, honest and industrious and everything else that would go to make a good boy for that position." Others testified to his general good character and habits.

It is insisted by counsel for plaintiff in error that because it does not appear what occurred between the deceased and the defendant from the time they left the house to go up the street until his return that he is entitled to the presumption that the murder was of the second degree. The jury had before it his acts and declarations immediately after the commission of the crime and there is no intimation from him in any way of any provocation to induce the act. He says, "I killed her because I loved her." He certainly had a very emphatic way of expressing his love. He returned to the house with the razor in his hand, evidently the weapon with which he committed the deed, and had made one cut therewith at his own throat, but it seems that his courage failed him and he did not complete the work upon himself. As to whether the evidence and circumstances are sufficient to overcome the presumption that it was murder in the second degree is purely a question for the jury and they are the judges of the weight of the evidence. The affidavits mentioned in the bill of exceptions No. 1, in regard to after discovered testimony refer to the fact that while Tucker was in the house soon after the commission of the crime and in custody, he asked for a pen or pencil, stating that he wanted to write a letter to his brother. Carter says he handed him a pencil, then Tucker said he did not want a pencil but he wanted a pen; that Carter then got him a pen and with the pen and ink which was on

the table, Tucker wrote on the back of a book which was lying on the table, covered with a piece of wrapping paper, a letter to his brother, which Carter recollected as reading about as follows: "Dear Brother: I killed myself, come at once. I am in a serious condition," or words to that affect. W. A. Smith in his affidavit, says Tucker said, "Give me a pencil or pen and ink I want to write to my brother;" that Frankling got Tucker a pencil and Tucker picked up a story book lying on the table, which had been covered with yellow wrapping paper and on said cover started to write a letter to his brother. After he had written some of it he started up and began "hollowing" and among other things said, "I want to see my mother, where is she?" and his actions were so very violent that Roy Ford and Jack Carter had to hold him, and after a short time Tucker quieted down and finished writing the so-called letter to his brother; that as far as affiant could recollect the letter read: "Dear Brother: I have killed myself. Come at once. I am in a serious condition;" that he was a witness on the trial of Tucker on behalf of the State and was not asked by the prosecuting attorney nor by the attorney for the prisoner anything about the letter; that if he had been asked in regard to the same he would have stated all about it. Mr. Frankling's affidavit was about to the same effect. He stated that he was a witness on the trial but was not asked in regard to the letter; that during the trial affiant saw a big role of papers in front of the prosecuting attorney but did not discover or see the letter written on the said piece of yellow paper; that affiant could not read or write, but recognized the letter from the color of the paper and for the reason that it was torn from the book cover, as before stated. The writing of this letter to his brother by Tucker was mentioned by the witness, J. E. O'Neal, on the trial, who said that Tucker wanted to write a letter to his brother. I believe he did write some words to his brother." There is nothing in the record to show that defendant did not know of this letter at the time of the trial or that he could have known, and there is nothing to show why the facts stated in the affidavits were not brought out on the trial, besides they are only cumulative, I take it an effort to show the mental condition of the defendant at the time and were not such facts if proved as could have affected or changed the verdict. In *State* v. *Betsall,* 11 W. Va.

703, (syl. pt. 5), it is held: "To authorize the granting of a new trial on the ground of after-discovered evidence, four things are necessary: 1. The evidence must have been discovered since the former trial. 2. It must be such as reasonable diligence, on the part of the party asking it, could not have secured at the former trial. 3. It must be material in its object, and not merely cumulative, corroborative or collateral. 4. It must be such as ought to produce on another trial an opposite result on the merits." *State* v. *Lane,* 44 W. Va. 730, (syl. pt. 3). "Newly discovered evidence apparently insufficient to change the result will not justify a new trial."

The second assignment of error as set out in bill of exceptions No. 2, is, that after the verdict of the jury had been rendered the defendant in error moved the court to correct its record of January 30th, according to the facts; that the prisoner pleaded to said indictment by counsel and not in person and offered in support of his motion the affidavits of the defendant, his attorney, W. F. Smith, John F. Laird and W. E. McDougle. Which affidavits being objected to, the court refused to permit them to be filed and refused to make a change in the record, which shows that the defendant, "Thomas Tucker who stands indicted for felony was this day set to the bar in custody of the jailer of Wood County, thereupon said prisoner for plea says he is not guilty as in the indictment against him is alleged, and of this he puts himself upon the country and the prosecuting attorney doth the like and issue thereon is joined." There is no dispute about the fact the defendant was present in person in court when the plea of not guilty was entered. The plea was entered in open court in the presence of the court and the order entered up showing the entry of the plea and the presence of the defendant and it was the duty of the court to see that its orders were properly entered, and it is very improbable that he would accept a plea of not guilty from the attorney. When the indictment is read to the prisoner the question is put to him personally, "What say you, guilty, or not guilty." There is no mention in the order of any motion to quash the indictment, in connection with the entry of the plea which defendant's counsel insists that he made. The plea was entered on the 30th of January, and no motion was made to correct the record or to call in question its correctness until the 14th day of March after

the rendering of the verdict on the 14th day of February, 1902. To permit attorneys to come in weeks after the record has been entered up and after verdict has been rendered and change the record on affidavits based on recollection of what occurred in open court would establish a very pernicious practice. Under the rulings in the case of *State* v. *Allen,* 45 W. Va. 65, (Syl. pt. 4), the record sufficiently shows that the defendant pleaded in person.

The third assignment of error as set out in bill of exceptions No. 3, is that after the court had overruled the motion to grant a new trial on the ground that the verdict was contrary to the law and the evidence, and had refused to correct the record and the defendant moved the court in arrest of judgment on the ground that the grand jury, which found the indictment was not legally and properly empaneled and sworn, and for other errors apparent on the record, which motion was also overruled and excepted to. The office of a bill of exceptions is to call the attention of the court to some specific matter as to which error is claimed. 11 Cyc. 714, and in 3 Enc. Pl. & Pr. 409. "The duty rests upon the appellant or party claiming to have been prejudiced to prove the alleged error, he must, when he relies upon the bill of exceptions, show by means of it the error complained of clearly and affirmatively; and he must further show in order to have relief, that such error was prejudicial." The bill of exceptions relied upon moved the court in arrest of judgment on the ground that the grand jury which found the indictment in this case was not legally and properly empaneled and sworn. It fails to point out in what respect the empaneling of the grand jury was illegal or irregular. The record shows: "On January 27, 1902, W. Vrooman, gentleman, foreman, this day appointed as such by the court and J. R. Reynolds (and fourteen others naming them), were empaneled and sworn a grand jury of inquest in and for the body of the county of Wood, and having been charged were sent to their room to consider of the business before them." The empaneling of the grand jury seems to have been regular and the bill of exceptions fails to point out any particular irregularity therein. In the absence of anything showing to the contrary the presumption is that the proceedings in summoning the grand jury were regular. It is insisted by defendant that under his motion in

arrest of judgment a general instruction given by the court on its own motion after having given the instructions asked by the State and by the defendant can be brought in review, although the said instruction is mentioned in no bill of exceptions, yet it is copied in the record as having been given. The instruction is in the words following: "Upon the indictment you may find the defendant guilty of murder in the first degree, and if so, you may say so in so many words, or you may add to that verdict a recommendation that he be confined in the penitentiary for life. You may also find a verdict of murder in the second degree; also a verdict of manslaughter, and involuntary manslaughter. You may find any one of these verdicts." It is insisted in defendant's brief that this instruction plainly implied the guilt of the prisoner, entirely disregarding the presumption of innocence until he was proven guilty by competent evidence and beyond all reasonable doubt. But bill of exceptions No. 4, which gives the instructions asked by the State and by the defendant and also includes two instructions given by the court in addition to those asked, omits the instruction in question. Under the rulings of this Court as held in *Park* v. *Petroleum Co.,* 25 W. Va. 108, and in other cases since, the said instruction cannot be considered by this Court as having been made a part of the record. The instruction complained of even if given and made part of the record could not mislead the jury as they had just been instructed on motion of the defendant that "It is the duty of the State to establish these charges contained in the indictment and each and every material allegation thereof by competent evidence beyond all reasonable doubt;" and they had also been instructed on motion of the defendant, "That where a homicide is proven the presumption is that it is murder in the second degree. If the jury believe from the evidence that the accused was so intoxicated as to render him incapa¹ of forming a deliberate and premeditated design to take human life, or was so drunk as to render him incapable of doing a wilful, deliberate and premeditated act, then the jury cannot find the accused guilty of murder as alleged in the indictment." So that the instruction complained of if given was simply to indicate to the jury the various degrees of crime of which he might be found guilty in case the evidence should warrant it and under

the evidence and circumstances of this case the instruction was favorable to the defendant rather than prejudicial.

The fourth assignment of error as set out in bill of exceptions No. 4, overruling defendant's objections to the nine instructions given for the State. The first instruction given for the State is taken from Mayo's Guide, 347, 348, defining murder and what it takes to constitute it, and correctly propounds the law.

The second instruction given for the State set out in this bill of exceptions is as follows: "The court instructs the jury that to convict one of murder it is not necessary that malice should exist in the heart of the accused against the deceased. If the jury believe from the evidence that the prisoner was guilty of cutting, with a deadly weapon, the deceased, and of killing her, the intent, the malice and the wilfulness, deliberation and premeditation may be inferred from the act, and such malice may not be directed against any particular person, but such as shows a heart regardless of social duty and fatally bent on mischief." This instruction seems to have been prepared from the first instruction given in case of *State* v. *Welch,* 36 W. Va. 690. It is there said by JUDGE BRANNON in delivering the opinion of the court: "The first sentence of this instruction propounds the law correctly; the latter part of it after the word 'act' also lays down the law; but that portion which says 'if the accused was guilty of striking with a deadly weapon another and of killing him, the intent, the malice and wilfulness, deliberation and premeditation may be inferred from the act, is not the law. This instruction was taken from the first syllabus of the *Douglas Case,* 28 W. Va. 297, but inserts the words, 'wilfulness, deliberation and premeditation.' In the *Douglas Case* there was a verdict of murder in the second degree, and the syllabus referred to makes out a case of murder in that degree." The instruction is in the *Welch Case* discussed at length, and after giving the circumstances of the case the Court concludes that there was no error in giving the instruction. It is further said in that opinion, "These being the circumstances, was it error, in law, to tell the jury they might find the presence of wilfulness, deliberation and premeditation from the use of a deadly weapon? If there be a homicide, and it be with a deadly weapon, and the jury should find it to be murder in the first

degree, could a court set aside the verdict as without sufficient evidence? I think not. Then an instruction that they may infer wilfulness, deliberation and premeditation from the use of such a weapon cannot be erroneous. If a man shoot another with a gun, what does he mean.? We may say he intends to kill. Using a deadly weapon, he is taken to intend the reasonable, natural consequences of this act. *Cain's Case,* 20 W. Va. 681; *Hill's Case, supra; Murphy's Case,* 23 Grat. 960. The use of a deadly weapon has always been treated by courts as a material circumstance or factor in passing on the degree. *Cain's Case, supra; Hill's Case, supra; Mitchell's Case,* 33 Grat 878; *Wright's Case, Id.* 895; *Wright's Case,* 75 Va. 920; *Jones' Case,* 1 Leigh 598. And in *Honesty's Case,* 81 Va. 295, Judge Richardson, says: "It is clear that a jury may presume premeditation from the giving of a mortal blow with a deadly weapon in the previous possession of the slayer, leaving him, as this instruction leaves him, to repel the presumption by proof of extenuating circumstances."

It cannot be said from the evidence in this case that the verdict of the jury was not sustained. We have the repeated voluntary confession or statements of the defendant who returned to the house with the bloody razor in his hand within twenty minutes after he and the deceased had left together, and with blood upon his clothes, that he had killed Mary Bell; that he killed her because he loved her; that he had killed her and ought to go to hell, and wanted to kill himself, but at no time intimated that she had given him even slight provocation for the act.

The third instruction mentioned in the bill of exceptions is to the effect that if the jury believes from the evidence that the defendant, with a deadly weapon in his possession, without any or upon slight provocation gave the deceased a mortal wound from which she died the defendant was *prima facie* guilty of wilful, deliberate and premeditated killing and the necessity of showing extenuating circumstances rested upon the defendant, or they must appear from the case made by the State, otherwise he was guilty of murder in the first degree, although no motive for the crime was disclosed or any ill feeling shown to have existed between the parties. This is substantially the instruction given in the *Welch Case* before cited, and there held to be good;

citing *Cain's Case,* 20 W. Va. 681, and *Hill's Case,* 2 Grat, 295, and *Honesty's Case,* 81 Va. 292, 295.

The fourth instruction is to the effect that no particular period is necessary that malice should have existed or that a person should have contemplated. homicide in order to constitute murder, and if the intent to kill is executed, the instant that it springs into mind the offense is as truly murder as if it had dwelt there for a longer period, and the sixth instruction is to the same effect and held to be good law in the *Welch Case.* The fifth instruction is to the same effect as the third.

The seventh instruction is "That the question of whether or not a particular weapon or instrument is deadly is one of law for the court and further that a razor, such as shown in the evidence, given to the jury is a dealy weapon." The first part of this instruction I regard too broad as a general proposition of law; yet the authorities differ on this, see sec. 320; Bishop on Statutory Crimes, (3d ed.), which rather supports the instruction, but the cases there cited are not all in record with it. But in any event it is rendered utterly harmless to prejudice the defendant, by the last part of the instruction which applies it to the weapon shown in the evidence to have been with which the crime was committed.

Instruction No. 8 is based upon substantially the same as point three in syllabus in *Robinson's Case,* 20 W. Va. 713. Instruction No. 9 is substantially to the same effect as No. 8. Instruction No. 10 relates to what constitutes under the law, a reasonable doubt and is sufficient; and after giving the instructions asked by State and the defendant the court instructed the jury that if they "believed from the evidence that the accused was intoxicated at the time of the killing, such evidence is competent for the consideration of the jury upon the question whether the accused was in such a condition of mind as to be capable of deliberation and premeditation."

The fifth assignment of error as set out in bill of exceptions No. 5, is to the ruling of the court on permitting the witness for the State, W. A. Smith, on being recalled, to be asked the question by the State, "I want to ask you, after you left the house whether you heard any remarks of the defendant here on your way to jail," and was answered, "Yes sir, I forgot that when I was on before. After we had started to jail with him he got

round' the corner about thirty steps I presume, he says, 'I killed her and I ought to go to hell for it.'" It is claimed by defendant's counsel in his brief that Smith had been examined-in-chief and was recalled without the permission of the court; that the question was improper and leading. There is nothing in the record to show that the court's permission was not had to recall the witness and the fact that the court overruled the objection to the question shows that the court permitted it.

This witness was recalled before the State had closed its evidence-in-chief, to supply an omission, and was not improper, it was a matter for the exercise of a sound discretion of the court. *Hassil's Case,* 5th Grat 664.

The sixth assignment of error as set out in bill of exceptions No. 6 is an objection to the evidence of witness for the State, E. L. Landsittle, being asked whether he knew Thomas Tucker, defendant, how long he had known him and whether he was acquainted with his habits and disposition and what he had noticed about him.? He answered that he had known him about five years, and was asked "What was his character as you observed it in regard to being quarrelsome or peaceable?" A. "Well I have noticed when he was drinking a little he was naturally quarrelsome." This testimony was given in rebuttal, the defendant having offered proof in relation to his character and disposition, and was not improper.

The seventh assignment of error as set forth in the seventh bill of exceptions, exceptions were taken in the examination of witness J. L. Frankling where he was asked: "Q. When Tom first came home did you notice any blood on him? A. He had a little blood on his hand and on his cuff. Q. Did you notice anything in his hand? A. He had a razor. Q. Look at the razor now shown you and see if that is the same razor. A. I think that is the same razor. Q. Just show it to the jury." And the razor was shown to the jury and inspected by them. The defendant objected and excepted thereto. The razor was identified by the witness as the same brought home by the defendant in a few minutes after the killing. It was also identified by witness, Dr. W. S. Keever. The razor was properly shown to the jury. The weapon or instrument by the use of which a homicide or other felony is committed, when the same can be identified, is invariably exhibited to the jury. The only

question which can be raised is as to its identity. And the evidence of the blood on defendant's hand and cuff as stated by witness, Frankling, was proper to go to the jury. *State* v. *Baker,* 33 W. Va. 319. In *State* v. *Welch,* cited, (Syl. pt. 7), it is held: "The question whether a particular homicide is murder in the first or second degree is one of fact for the jury. Where a jury has found the case to be one of murder in the first degree, as in other cases, the court should not disturb the verdict, unless the finding of murder in the first degree be plainly and manifestly contrary to, or without sufficient evidence."

I can understand why counsel for a defendant in case of murder or other felony should seek to have the court instruct the jury on all conceivable points, in the hope, perhaps, of having the court in the hurry and possible confusion of business refuse a proper instruction, thereby laying a foundation for a new trial for his client; but why a prosecuting attorney should incumber the record with innumerable instructions to the jury, often endangering, with doubtful instructions a case otherwise so plain that a jury could scarcely err, is to me an enigma; under our system of constituting juries, the average jury should be presumed to have at least a reasonable degree of intelligence and fitness for the responsible duties imposed upon them by the law.

There is no reversible error shown in the record and the judgment must be affirmed.

*Affirmed.*