# CHARLESTON.

## STATE v. MEDLEY.

Submitted June 3, 1909.   Decided November 16, 1909.

1. JURY—*Jury Commissioners—Failure to Take Oath—"Defacto Officer"—Motion to Quash Venire.*

    A jury commissioner, who has been regularly appointed by the court and who is otherwise qualified, but who has failed to take and subscribe the.oath prescribed by section 3, chapter 116, Code, is, notwithstanding, a *de facto* officer; and, as between third parties, his acts performed in the discharge of his duties as such jury commissioner are valid. (WILLIAMS, J. dissenting).   (p. 218).

2. SAME—*Motion to Quash Venire.*

    A motion, made by a prisoner about to be tried for crime, to quash the venire and discharge the panel on the ground that

the list of names of persons to serve as jurors, from which the panel was drawn, was selected by two jury commissioners one of whom had not taken the oath prescribed by section 3, chapter 116, Code, is properly overruled. (WILLIAMS, J., dissenting).  (p. 218).

3.  SAME—*Jury Commissioners—Time of Meeting—Directory Statutory Provisions.*

So much of section 3, chapter 116, Code, as applies to the time of meeting of the jury commissioners for the purpose of selecting the annual list of persons to serve as jurors is simply directory, and a substantial compliance therewith is sufficient.  (p. 221).

4.  SAME—*Number Summoned—Directory Statutory Provisions.*

Section 7, chapter 116, Code, respecting the number of jurors to be summoned by the clerk is directory, and the issuance of the writ for a greater number than thirty, without an order of court directing it, is a substantial compliance with the statute.  (p. 222).

5.  CRIMINAL LAW—*Trial—Requested Charge Covered by Charge Given.*

It is not error to refuse an instruction asked for by the accused, if another instruction embracing the same points of law, free from objections and not in any manner prejudicial to the accused, has been given on behalf of the state.  It is not necessary that the same instruction should be twice given.  (p. 224).

6.  HOMICIDE—*Trial—Instructions.*

When, in a trial for murder, the prisoner had introduced evidence tending to justify the homicide on the grounds of self defense, and the jury have been properly instructed as to the law of self defense, it is not error to give the following instruction, viz:  "If they believe from the evidence in the case that the accused was guilty of shooting the deceased with a deadly weapon and killing him the intent, the malice and wilful deliberation and premeditation may be inferred from the act."  (p. 225).

Error to Circuit Court, Mercer County.

John Medley was convicted of murder in the first degree, and he brings error.

*Affirmed.*

*Hale & Pendleton,* for plaintiff in error.

*William G. Conley, Attorney General,* for the State.

WILLIAMS, JUDGE:

At the July term, 1908, of the criminal court of Mercer county

John Medley was indicted and tried for the murder of one Neely Shannon. He was convicted of murder in the first degree and sentenced to be hanged. The judge of the circuit court of Mercer county refused a writ of error, and on the 27th of January, 1909, defendant obtained one from this Court.

Defendant took two several bills of exceptions, the first of which embodied his exception to the action of the court in overruling his motion to quash the writ of *venire facias* on the grounds, (1) that one of the jury commissioners who made up the list of jurors from which the panel was drawn was not a qualified jury commissioner; (2) that the jury commissioners did not prepare the list of persons who were to serve as jurors at the time required by law; (3) that the clerk issued the writ for more than the number of jurors required by law, without authority of court.

Samuel R. Holroyd, one of the jury commissioners that made up the list from which the panel was selected, had not taken the oath prescribed by section 3, chapter 116, Code; and the prisoner moved to quash the venire and discharge the panel, before the jury were examined on their *voir dire*, and the court overruled his motion. Was this error? The majority of the court are of the opinion that it was not, for the reason that Samuel R. Holroyd, by virtue of his appointment, had color of title to this office of jury commissioner, and that his acts, being the performance of a duty in the interest of the public, are to be regarded as those of a *de facto* officer and, therefore, valid. *Building & Loan Ass'n.* v. *Sohn,* 54 W. Va. 101, and authorities cited on pages 114 and 115; *Knight* v. *Town of West Union,* 45 W. Va. 194; 29 Cyc. 1389; Thompson & Merriam on Juries, section 63; *Rafe* v. *State,* 20 Geo. 60. But I am unable to agree with the other members of the Court on this subject. My opinion is that the taking of the oath prescribed is an essential element of a jury commissioner's power to act; that the legislature plainly intended this provision of the statute to be mandatory; that the failure to take the oath renders void the acts of such so-called jury commissioner; and that the prisoner could take advantage of this want of qualification by motion to quash the panel, made before the jury had been sworn to try the issue. No one questions the power of the legislature to prescribe the manner in which juries are to be selected, and to fix the qualifi-

cation of jury commissioners, and I can hardly imagine how language could have been framed to express any more certainly the intention of the legislature to make this provision imperative than is done by the language employed in the statute. It says: "before entering upon the discharge of their duties, the jury commissioners shall take and subscribe an oath" etc. I do not think the principle which has been so often applied by the courts in upholding the acts of officers *de facto*, done under color of title to office, can properly be invoked to support the acts of a jury commissioner who had never been qualified to act. The legislature, I think, has made the oath an essential qualification before power to act is conferred; it is jurisdictional and fundamental; and a prisoner tried by a jury selected from a panel drawn from a list of names of persons to serve as jurors made up by two jury commissioners, one of whom had not taken the oath prescribed, is not tried in the manner provided by law. Such a trial was without due process, and in such case it was not necessary for the prisoner to show that he was prejudiced; he had a right to demand a trial by a jury selected by jury commissioners who should be qualified in the manner the law provides. The following authorities support this view, viz: *State* v. *Williams*, 30 La. 1028; *State* v. *Flint*, 52 La. Ann. 62; *State* v. *Bryce* 11 S. C. 342; *Hall* v. *Commonwealth*, 80 Va. 555; *Richards* v. *Commonwealth*, 81 Va. 110; *Jones et al* v. *Commonwealth*, 41 S. E. 951; 12 Enc. Pl. & Pr. 282; 24 Cyc. 211.

A further objection is urged that the list of jurors, from which the panel was drawn, was not made up at the time required by law; that it was not done at the levy term of the county court. The statute directs the list to be made up at the levy term of the county court, annually, "and at any other time when required by the circuit court of such county;" or, in the present case, by the criminal court of Mercer county. The record shows that the list was made up on the 22nd and 23rd days of July, 1907. The order entered of record by the jury commissioners themselves shows that they met in the clerk's office of the criminal court of Mercer county, on the 22nd day of July, 1907, the order reciting: "It being the levy term of the county court," and that on that day they proceeded to prepare a list of persons qualified to serve as jurors and that, not having completed their work, they adjourned until the next day; and on

the next day, not having completed their work; they adjourned until the following day; and on the third day they met and completed their work. The record also shows that the county court met on "Tuesday the 2nd day of July, 1907;" that on this day it entered an order adjourning until "July 23rd 1907;" and that on the 23rd of July it met and adjourned until the "31st day of July, 1907."

The Acts of the Legislature, 1907, chapter 63, amending and re-enacting section 29 of chapter 39 of the Code, fixes the time when the levy term must begin. This act provides that: "The county court of every county shall, at a regular or special session of said court, held for the purpose on the first Tuesday of July in each year, proceed to make up an estimate of the amount necessary to be levied for the current fiscal year to cover all county debts and liabilities payable during each year" etc. It provides that said estimate shall be published in at least two newspapers of opposite politics in the said county, if there be such, for at least three weeks, showing the amount to be levied for; and further provides that the court shall stand adjourned until said publications shall be completed, and shall then reconvene "on the first Tuesday after said publications have been made," and make such corrections in the estimate as may appear to the court necessary and proper. The statute then says: "The said court shall thereupon levy so many cents on every hundred dollars of the valuation of the property taxable in the county, according to the last assessment thereof, as will cover the estimated amount necessary to be raised for county purposes" etc. The effect of this act is to fix the levy term of the county court on some Tuesday, late in the month of July. The record in this case shows that the county court met on the 2nd day of July, 1907, which was a Tuesday. If the 2nd was a Tuesday it was necessarily the first Tuesday in the month. The court then adjourned until the 23rd of July, 1907, which evidently was also a Tuesday, the 2nd of the month being Tuesday. The 23rd must also have been the first Tuesday after the completion of the publications of the estimates as required by the statute. This day was, therefore, the beginning of the levy term, whether the court actually made the levy on that day or not; because the statute, in express terms, adjourns the court from the first Tuesday in July to the first Tuesday after the completion of a three

weeks publication beginning just after the first Tuesday, before it can make the levy. It is then authorized to make the levy, but not until it has heard complaints and corrected the estimate, if it finds any should be made. This may require more than one day. Hence, the levy term may embrace more than one day. The statute does not prohibit the court from adjourning to the next, or to some future day, in order to complete the business of making the levy.

It is not necessary that the county court should be actually sitting at the same time the jury commissioners are meeting for the purpose of performing their duties, in order to render valid the act of the jury commissioners. There are no reciprocal duties to be performed by them, and no assistance that one set of commissioners could render to the other. Apparently, the only purpose of the act in designating the levy term of the court as the time at which the jury commissioners should meet to make up their list is to fix some definite annual period when it should be done. In respect to the time of meeting the statute is simply directory, and a substantial complance therewith is sufficient. *State* v. *Clark,* 51 W. Va. 457; Thompson & Merriam on Juries, section 145 and section 47. Suppose the county court should meet and complete its labors of making its levy in one day and adjourn *sine die,* and the jury commissioners should meet on the same day and be unable to complete their labors and should adjourn over to the next day in order to complete them, could it be said that the act of the jury commissioners would be void as not complying with the law? We think not. It would be extremely technical and wholly unreasonable to take such a view of the law. Suppose, on the other hand, that the jury commissioners should meet on the day previous to the convening of the county court and should not complete their labors, and should adjourn over to the next day, and then again to the next, completing its labors on the third day, would it not be just as technical and just as unreasonable to hold their acts void in this instance as in the other? We think so; and we hold that this objection is not well founded.

It is further insisted that the writ of *venire facias* should have been quashed because the clerk issued it directing the summoning of fifty jurors instead of thirty, without any order of court directing him to do so. It does not appear

that the court had previously made any order respecting the summoning of jurors. This is a mere irregularity in the writ not affecting its validity, and we fail to see how the defendant could in any wise be prejudiced by the summoning of a greater number of jurors than the law directs. However, it might be fatal to the writ if it had issued for a *less* number than the statute required.

Under the statutory method of selecting juries in this State, and in fact under the law now in force in most of the states, the writ of *venire facias* bears but little resemblance to the ancient writ, and the issuance of it seems now to be almost, if not altogether, a useless requirement. Under the common law practice the sheriff was intrusted with the duty of making the selection of the men to be summoned as jurors, and the writ was his authority to do so; whereas under our statute, he has no power to select. The names of persons to serve as jurors are drawn from the jury box by the jury commissioners, and a list of the names thus drawn is given to the sheriff, and he cannot summon any one whose name does not appear on the list. Thomp. & Mer. on Juries, section 70 and cases cited. In 24 Cyc. 221, we find: "It is a ground of challenge to the array if the panel consists of less than the number prescribed by statute, but not where it is larger than the statute requires." And in Enc. Pl. & Pr. 239, the law is thus stated: "There seems to be no good reason for quashing a panel because more than the statutory number or the number recognized at common law were summoned, at least, unless the statutory requirement as to number is mandatory, or special circumstances exist whereby there may be prejudice." The following authorities support the text, viz: *U. S.* v. *Insurgents,* 2 Dall. (U. S.) 335; *Prall* v. *Peet,* 3 La. 274; a Hale's Pleas of the Crown 263; *Barber* v. *James,* 18 R. I. 798; *Fitchburg R. Co.* v. *Boston &c. R. Co.,* 3 Cush. (Mass.) 58; *Hosmer* v. *Warner,* 15 Gray (Mass.) 46; *Anderson* v. *State,* 5 Ark. 445; *Bronson* v. *People,* 32 Mich. 34.

"That the panel of jurors contained a greater number than prescribed by law is not an error to which the defendant could object. The error is in his favor, and he could not complain—the state might." *Anderson* v. *State,* 5 Ark. 445.

The statute directing the summoning of thirty jurors is an economic provision to avoid the summoning of more jurors than

might be really needed to transact the business of the court, and in this particular the statute is simply directory. The summoning of a greater number than thirty is not fatal to the writ.

It is assigned as error that evidence was admitted over defendant's objection respecting the shooting of his father by deceased some two or three years before the trial. Some of the witnesses for the state testified that defendant declared, after the killing, that he had shot deceased because deceased had some time before that shot defendant's father. This, of course, was competent evidence to show defendant's revengeful state of mind toward deceased, and to show motive for the killing. He was not prejudiced by the further proof by the state that deceased had been tried for shooting prisoner's father, and was acquitted. *State* v. *Lane,* 44 W. Va. 730 (29 S. E. 1020) ; *State* v. *Bickle,* 53 W. Va. 597 (45 S. E. 917).

The refusal to give defendant's instruction No. 5 and the giving of No. 8 in lieu of it is assigned as error. Both instructions are upon the same question, that of homicide and its various degrees. No. 5 tells the jury that they may find one of four verdicts in the case, if the evidence warrants it, to-wit: (1) murder in the first degree; (2) murder in the second degree; (3) voluntary manslaughter and (4) not guilty. It then proceeds to define the three degrees of homicide above mentioned, and gives the character of punishment applicable to each degree. Instruction No. 8 is a copy, word for word, of No. 5 with the exception of two additional verdicts that might be found, viz: (1) involuntary manslaughter and (2) assault and battery, thus making six possible verdicts, any one of which might be found if the evidence warranted it. This instruction then proceeds to define, correctly, all five degrees of crime, the first three in the exact language of No. 5 that was refused, and also gives the punishment applicable to each.

The objection urged is that No. 8 introduces two degrees of crime not possible to be found, because there is no evidence to support either, that is, involuntary manslaughter and assault and battery. No. 5 correctly states the law, and we ·fail to see any good reason for its refusal by the court. On the other hand, No. 8 is exactly like it with the exception that it tells the jury that either one of two lesser degrees of crime might be found under the indictment, which are not mentioned in No. 5. But is de-

fendant prejudiced by the giving of No. 8 instead of No. 5? If
the evidence warrants the finding of a greater degree of homicide,
we can not see how the accused could · be prejudiced by the
court's telling the jury that they might find him guilty of a lesser
crime. Such error is in favor of, rather than against, the ac-
cused, and he has no right to complain of it. *State* v. *Prater,*
52 W. Va. 132 (43 S. E. 230) ; *Muscoe* v. *Commonwealth,* 87
Va. 460.

It is generally true, nevertheless, that in felony trials the ac-
cused is entitled to have his instructions given in his own lan-
guage, if they correctly propound the law applicable to the state
of facts as supported by any part of the evidence. *State* v.
*Evans,* 33 W. Va. 317. But, on the other hand, if a correct in-
struction be already given, it is not reversible error to refuse to
give another one which is, in all material respects, identical with
the one given.

It is likewise urged that it was error to give instruction No.
4 on behalf of the state. It reads as follows : "The Court in-
structs the jury that to convict one of murder, it is not necessary
that malice should exist in the heart of the accused against the
deceased. If the jury believe from the evidence in this case that
the accused was guilty of shooting the deceased Neeley Shannon
with a deadly weapon and killing him the intent, the malice
and the wilful deliberation and premediation may be inferred
from the act; and such malice may not be directed against any
particular person but such as shows a heart regardless of social
duty and fatally bent on mischief."

An instruction similar to this has been upheld by this Court
in at least two cases. First in the case of *State* v. *Welch,*
36 W. Va. 690, and second in *State* v. *Tucker,* 52 W.
Va. 420. In fact, the instruction seems to have been copied al-
most *verbatim* from the instruction given in the case first above
cited. But those two cases differ from the present one in this
respect: in the *Welch Case,* Welch was convicted of the murder
of his wife, and in the *Tucker Case,* Tucker was convicted of the
murder of a woman; and in neither case was there any eye wit-
nesses to the tragedy. But the wounds upon the dead bodies
proved, in both cases, that they had been murdered by the use of
deadly weapons. In neither case did the accused attempt to
justify, while in the present case the defendant attempts to jus-

tify on the ground of self defense and there is some evidence tending to prove that, at the time he shot him, Shannon was attempting to draw his pistol from his pocket with the intent to shoot accused. But this is not a binding instruction; it does not tell the jury that if they believe the facts recited in the instruction to exist, they must find the defendant guilty. The jury were properly instructed upon the law of self defense by defendant's instruction No. 2, and there was no error in giving the state's instruction No. 4.

Objection is also made to instruction No. 9 given on behalf of the State. This instruction is lengthy and bears on the question of what is necessary to constitute reasoable doubt in the mind of the jury as to the guilt of the accused. We do not think it necessary to set out the instruction in full. It was copied word for word from an instruction given in *State* v. *Bickle,* 53 W. Va. 597; and the instruction was upheld by this Court in the decision of that case. There was no error in giving it.

The prisoner's motion to set aside the verdict was overruled, and his exception to the action of the court in overruling it, together with the evidence, is made part of the record.

As is usual in such cases, the evidence is both volumnious and conflicting. But it is strong to sustain the verdict. It shows that the deceased, Neely Shannon, was shot to death by the defendant at the house of Etta Gore at Cash's Hill in Mercer county about seven o'clock on the evening of July 4, 1908, during the progress of a "negro festival" at which there were present some twenty or twenty-five persons. Deceased was the only white person there. A number of witnesses testify that they saw defendant step up behind deceased when he had his face to the wall, apparently gazing at a picture, and fire three shots in rapid succession into the back of his head and neck, and that deceased sank down and expired immediately. The proof is that any one of the three shots would have been fatal. Two passed through his head and one through his neck. The evidence is strong to establish the fact that the crime was a cold-blooded and cowardly murder. The verdict appears to be just, and the judgment of the lower court will be affirmed.

*Affirmed.*

POFFENBARGER, JUDGE, (concurring and sustaining Points 1 and 2 of the Syllabus).

We agree with Judge WILLIAMS in the view that section 3 of chapter 116 of the Code is mandatory. A jury commissioner must take the oath required by that section, else he is not an officer de jure. It is as obligatory upon him to take the oath, required by law, as it is upon other officers. His failure to do so occasions a legal vacancy in the office, but, if he performs its duties and no other person claim it and exercise its functions and powers at the same time, there is no actual vacancy. The office is occupied by a person who, technically, has no right to exercise its powers. His failure to take the oath constitutes ground for his removal or ouster from the position, but, so long as he is suffered to remain in, the actual incumbency and legal vacancy continue, and the acts of the incumbent are done colore officii. There is an office and a person filling it, though not rightfully. It is the duty of the appointing power to oust the de facto officer and we must presume this will be done and the office filled in law as well as in fact. Thus, we make the statute mandatory. We do not excuse or justify the failure to comply with its terms. It does not follow, however, that we must also invalidate the acts done by the de facto officer. Public policy demands that they be upheld. The functions of government cannot be performed, unless its offices are filled. The public business requires that somebody be recognized at all times as competent to discharge the duties of any given office. There are often contests and other legal proceedings, involving the ultimate and absolute right and title to the offices, during the pendency of which, it is more important that the functions of the offices be exercised, even though by persons not legally entitled to them, than that they should be closed, and the citizen unable to obtain the performance of those acts which the law vouchsafes to him for the protection of his life, his home, property and other interests. Suppose the case of contests, involving the title to every judicial office in the state. Would it be wise or prudent that all the courts be closed, pending the decision of the contests, so that no man could obtain a writ or order to protect his person or preserve his property rights? The evil of such an interregnum would be incalculable. This is a violent hy-

pothesis of course, but it serves to illustrate the principle. It is important to the citizen that every office be occupied, open and in operation all the time. Hence, the legislature, having undoubted authority to do so, has wisely ordained as follows: "All judgments given and all acts done by any person, by authority or color of any office, or the deputation thereof, under the restored government of Virginia or of this State, before his removal there from, shall be valid, though it may afterwards be decided or adjudged that he was not lawfully elected or appointed or was disqualified to hold the office, or that the same had been forfeited or vacated." Code, chapter 7, section 15.

MILLER, President, and BRANNON and ROBINSON, Judges, concur in this note.