STATE OF WEST VIRGINIA

*v.*

EVERETTE WHITT

(No. 9822)

Submitted September 4, 1946. Decided October 1, 1946.

*Salisbury, Hackney & Lopinsky,* R. H. *Casto* and *Lon G. Marks,* for plaintiff in error.

*Ira J. Partlow,* Attorney General, *Ralph M. Hiner,* Assistant Attorney General, and *Eston B. Stephenson,* Special Assistant Attorney General, for defendant in error.

KENNA, PRESIDENT:

In the Circuit Court of Logan County Everette Whitt was convicted of murder in the first degree for the killing of Mae Elkins by the discharge of a shotgun on the 21st day of August, 1945. The verdict of the jury further found that he be punished by confinement in the penitentiary with the result that the sentence was life imprisonment. This writ of error was granted upon a petition assigning twenty-seven alleged errors. Of the six assignments briefed and submitted, one is based upon the giving of State's Instruction No. 1A, one upon the admission of photographs of the victims body at the scene of the killing contended to have inflamed the minds of the jury to the prejudice of the accused, one upon four alleged erroneous rulings admitting testimony on behalf of the State, and the remaining three upon the insufficiency of the State's evidence to sustain a verdict of murder in the first degree. These assignments will be dealt with in the inverse order of their statement, beginning with the three assignments having to do with the entire evidence.

The record shows that the Whitt and the Elkins families lived on adjoining land on the right hand side of Rocky Creek, a short distance from Chapmanville. An unpaved public road went up Rocky Creek on its right bank to a point above their properties, the Elkins land not extending beyond the creek but the Whitt farm lying on both sides. The road crossed the creek on what seems to have been a log bridge fifty or sixty feet above a roadway from the public road into the Whitt property, which roadway, where it connected with the public road, was up the creek approximately one hundred, twenty-five yards above the Elkins house. The Elkins home is within a few feet of the public road and of the property line between the two places. It is on a bend so that the Whitt house could be seen by a person standing either behind or in front of that of the Elkins. The Whitt home is back from the road about sixty feet.

A few days before the shooting occurred the bridge had been repaired by WPA labor and new timbers had been put in place of the old that had been left by the workmen below the bridge in the bed of the creek. Ben Elkins, husband of Mae Elkins, and two of the Elkins boys had taken part in this work and had intended to take the discarded timbers to their home for what they call "wash wood", evidently wood used in heating water for the purpose of washing clothes out of doors. Billy Elkins, aged twelve, had gone up to the bridge the morning before the shooting occurred with a mule for the purpose of "snaking" the discarded timbers to the Elkins home to be so used and had then been told by Everette Whitt that the wood belonged to him and to "get down the road", which he did without attempting to take the wood. That evening the Elkins discussed the occurrence at the supper table and the father told his boys to leave the wood alone because he did not want to have trouble concerning it. On the following morning after the father had gone to work, Ben Elkins, aged seventeen and known as "Junior", together with Billy, went up the creek with a mule for the purpose of dragging the logs to the Elkins home. They were seen by Everette Whitt in the bed of the creek before they had attached the mule's harness to the timber. Whitt came to the creek with a cane that he was carrying, and after having taken the lines of the mule with which Billy was guiding it away from him, struck the mule so that it went down the creek toward the Elkins home with Billy after it. Whitt also struck Junior on the left arm or elbow with his cane so that Junior ran up the creek for a short distance. Whitt denies using his cane except to ward off a blow from Junior. As Billy was going down the creek toward the Elkins home he shouted that Whitt had hit Junior on the arm. This was heard by Margaret Elkins who promptly told her mother, who was in the kitchen preparing bread. Mae Elkins, the mother, at once left her house and started up the creek at a fast walk, passing both Junior and Billy, Junior having come down the road from above the bridge.

There is considerable difference in detail between the evidence of the State and that of the defendant, much of which is not consequential and cannot be discussed. However, concerning the sequence of happenings immediately preceding the shooting there is material conflict, partly expressed by the witnesses in language that is not clear.

The State's proof shows that after having gotten the two Elkins boys and their mule away from the logs and after Billy had shouted that Whitt had hit Junior and Mae Elkins had started up the road toward him, Whitt went quickly through a short cut to his house about forty or fifty feet away, got a single barrel, sixteen gauge shotgun and started down the path in his lot toward the road. He evidently stopped within thirty feet of the road and in the meantime Mrs. Elkins had reached the point on the road approximately that same distance below the Whitt private roadway. She had passed Junior coming down the road from above the bridge, as had Margaret. Junior testified that he was about seventy feet down the road from his mother when she was shot. Margaret Elkins was coming up the road with a twelve gauge, single barrel shotgun that she had gotten in the Elkins house when she saw Whitt leaving his home with a gun. She was followed by Billy. Whitt told Mrs. Elkins that if she knew what was good for her she would get down the road. She replied that she was on a public road where she had a right to be, called him a God damn son of a bitch and told him that he would have to pay for injuring Junior's arm. Whitt then shot her from a distance of between fifty and sixty feet. Margaret was within about ten feet of her mother when the shooting occurred. Junior was uncertain as to when he took the gun from Margaret, but she says that after her mother was shot he strode up the road to where she was, took the gun, closed the breech and fired at Whitt. Whitt, who had then reloaded his single barrel shotgun, fired at Junior, hitting him but not injuring him seriously, although he was hospitalized.

As stated, the testimony on behalf of the accused conflicts with that of the State in a number of respects, the defendant contending that it was his purpose to shoot Junior Elkins, who was armed at the time with a shotgun that he was preparing to discharge at him, the accused, and that he unintentionally struck Mrs. Elkins who at the time was standing quite close to Junior. Whitt also contends that he started to his house to get his shotgun after seeing Margaret Elkins start up the creek with the Elkins shotgun and that before the shooting occurred Mrs. Elkins had cursed him repeatedly and had thrown four or five rocks in an attempt to injure him. The defendant's sixteen year old son, Blake Whitt, testified that he saw the entire occurrence from his bedroom window on the second story of the Whitt home and that Mrs. Elkins, with Margaret Elkins running behind her with the shotgun, was throwing rocks at his father and cursing him before Whitt started to his house to get his shotgun and that before Whitt fired the shot that killed Mrs. Elkins, Junior Elkins had grabbed the shotgun from Margaret and was raising it to his shoulder with the purpose of shooting Everette Whitt while standing within a foot of his mother. Whitt denies taking the reins of the Elkins' mule from Billy and striking the mule with his cane for the purpose of driving it down the road. He says that he only struck Junior with his cane in order to ward off a blow that Junior intended for him. His version is that he did not start to his house until he saw Mae Elkins coming up the road and attempting to hit him with rocks and that when she got within twenty-five feet of him he "retreated" to his own property and at that time he saw Margaret Elkins about one hundred feet above the Elkins house coming up the road with the Elkins' shotgun. Whitt says that with Mrs. Elkins and Junior standing in the road at the mouth of the lane on his property and with Margaret coming rapidly up the road carrying the shotgun "it just come to me that I would go and get my gun", and that after he had gone into his house and gotten his gun, Margaret, Junior and Mae Elkins went into a "huddle" at the end of his lane,

down which he had walked until within about thirty feet of them. He then told them that he did not want trouble and Mrs. Elkins cursed him saying that she would not go any place. Whitt says that having seen Junior take the shotgun from Margaret he shot at Junior, holding the gun "under" his right arm, having his cane in his left hand, believing that Junior intended to kill him. He struck Mae Elkins unintentionally. Junior backed down the road several steps, raised his gun and fired. Whitt, having reloaded, fired back.

It will be seen that the outstanding differences between the testimony of the defense and that of the State are: one contends that Mae Elkins, the victim, and Junior Elkins, whom Whitt says he intended to shoot, were standing very close to each other, while the prosecution's testimony is that they were apart a distance of at least thirty feet, so that an unintentional killing of Mae Elkins by a person aiming at Junior was very unlikely; as opposed to Whitt's statement that he started to his house for his gun after Margaret Elkins was seen by him coming up the road with the Elkins' gun, the State's witnesses say that Margaret Elkins got the Elkins' gun after she saw Whitt start to his house for his gun; and as against the defense theory that Junior was armed when Mae Elkins was shot, the State's testimony is that he took the shotgun that Margaret Elkins had with its breech open immediately after his mother was killed. In addition, the defense says that Mae Elkins threw a number of rocks at Whitt so that it was necessary for him to dodge, while the State's witnesses deny this. That she cursed Whitt at least once after reaching his roadway or within a few feet of it, is admitted.

The verdict requires this Court to resolve doubts arising from issues of fact favorable to the theory of the State. Viewed from this standpoint we are of the opinion that the evidence of the State is sufficient to sustain a verdict of murder in the first degree, that that of the defense does not create a reasonable doubt as a matter of law, and that therefore the trial court was correct in

overruling the motion of the accused to set aside the verdict for the reasons stated in this assignment and grant a new trial.

As to the assignment having to do with the erroneous admission of testimony on behalf of the State, one objection was based upon a question asked Blake Whitt, aged eighteen, testifying for the accused, his father, as to why he had remained in bed on the second floor with his head out a window so that he could testify in detail, knowing that his father was not in good health. The question was objected to because argumentative. We believe that although the question might have been correctly excluded because repetitious, it was not erroneous to admit it over the objection made and that in any event its admission was nonprejudicial. One of the other objections was the refusal of the trial judge to permit Mrs. Whitt, the accused's wife, to testify concerning his physical condition. Whitt himself when on the stand testified that in 1939 he had been injured in a mining accident, that he was drawing a permanent total disability compensation award, that his spine pained if he remained in one posture any length of time, and that his lack of health made him extremely susceptible to provocations and irritations. No conflict arose concerning Whitt's condition so that Mrs. Whitt's testimony could have been nothing more than cumulative of admitted facts. The third point under this assignment consisted of asking Whitt, who had stated that he took his shotgun to protect himself, why he needed protection when he could have remained in his house "where they couldn't get him". We think the question went to the substance of the State's case and was admissible. The assignment's fourth point is based upon the overruled objection to the following question asked Everette Whitt on cross-examination: "Explain to the jury how you shot him in the back." Junior had testified that a few of the shot had struck him in the back, some in the side and arm. During his examination in chief he had removed his clothing and exhibited his back to the jury. How a single charge from a shotgun

could wound both in the side and back may not have been relevant to the issue, but under the circumstances we can see no prejudice to the accused in permitting the question to stand.

The photographs of Mae Elkins' body at the scene of the shooting, introduced as State's Exhibit No. 1 and State's Exhibit No. 2, were admitted as part of the testimony of Corporal Zirkle, of the Department of Public Safety, who had taken them during the course of the investigation of which he had charge. The objection does not rest upon the photographs' inaccuracy in portraying their subject matter but is based solely upon their unduly inflaming the minds of the jury to the prejudice of the accused. The introduction of photographs is a matter that is controlled very largely by the discretion of the trial judge and that is particularly true when the objection to their admission rests solely upon their unduly influencing the minds of the jury. There is nothing in this record except the photographs themselves from which any conclusion concerning undue influence can be reached. They are ghastly. The accused could not expect less than a full disclosure of the consequences of his conduct. There being no objection other than that the photographs unduly inflamed the minds of the jury, we cannot say that the trial court in overruling that objection abused its discretion.

The State's Instruction No. 1A, the giving of which is assigned as error, reads as follows:

"The Court instructs the jury that a man is presumed to intend which he does or that which is the immediate or necessary consequence of his act; and that if the jury believes from all the evidence and circumstances in this case, beyond a reasonable doubt that the prisoner, Everett Whitt, with a deadly weapon in his possession, without any or upon very slight provocation, gave to the deceased, Ruth May Elkins, a mortal wound, then he the prisoner is prima facie guilty of wilful, deliberate and premeditated killing, and the necessity rests upon the prisoner of showing extenuating circumstances, and

unless he proves such extenuating circumstances, or the circumstances appear from the case made by the State that he, the prisoner, is guilty of murder in the first degree."

This instruction is taken from the eleventh syllabus in *State* v. *Cain,* 20 W. Va. 679. It is also the sixth syllabus in *State* v. *Welch,* 36 W. Va. 690, 15 S. E. 419, the opinion citing the *Cain* case. The eleventh syllabus of the *Cain* case has been expressly approved in the following West Virginia cases, the first three of which feature it as a point of decision by carrying it in the syllabus: *State* v. *Greer,* 22 W. Va. 800, 816; *State* v. *Schnelle,* 24 W. Va. 767; *State* v. *Morrison,* 49 W. Va. 210, 214, 38 S. E. 481; *State* v. *Douglass,* 28 W. Va. 297, 302; *State* v. *Hobbs,* 37 W. Va. 812, 822, 17 S. E. 380; *State* v. *Hatfield,* 48 W. Va. 561, 573, 37 S. E. 626; *State* v. *Tucker,* 52 W. Va. 420, 432, 44 S. E. 427; *State* v. *Kellison,* 56 W. Va. 690, 698, 47 S. E. 166; *State* v. *Trail,* 59 W. Va. 175, 179, 53 S. E. 17; and *State* v. *Stewart,* 63 W. Va. 597, 600, 60 S. E. 591. All of the foregoing cases speak of death by the intentional use of a deadly weapon as creating a prima facie presumption, as does the eleventh syllabus of the *Cain* case. The opinion in *State* v. *Bowles,* 117 W. Va. 217, 221, 185 S. E. 205, cites but three West Virginia cases to uphold the rule that deliberation and premeditation may be so inferred, without drawing a distinction between an inference and a presumption. They are *State* v. *Medley,* 66 W. Va. 216, 66 S. E. 358, 18 Ann. Cas. 761; *State* v. *Tucker,* 52 W. Va. 420, 44 S. E. 427; *State* v. *Welch,* 36 W. Va. 690, 15 S. E. 419. The *Bowles* opinion also cites three West Virginia cases stated as disapproving that rule. The first is *State* v. *Whitt,* 96 W. Va. 268, 122 S. E. 742, in which a similar instruction, differently worded, was held bad because stating only an abstraction. In *State* v. *Coleman,* 96 W. Va. 544, 123 S. E. 580, a like instruction was disapproved as being abstract and as ignoring material evidence of accused's mental irresponsibility and the absence of premeditation. The third case cited in the *Bowles* opinion as disapproving is *State* v. *Garner,* 97 W. Va. 222, 124 S. E.

681, in which a reversal was based upon the fact that in a like instruction as that approved in principle by the *Cain* case the reference to extenuation was omitted. Another case, not cited in the *Bowles* opinion, disapproving the substance of the instruction in question as being abstract and not applicable in the case then before the Court is *State* v. *Best,* 91 W. Va. 559, 113 S. E. 919. In the opinion in the case of *State* v. *Farley,* 125 W. Va. 266, 272, 23 S. E. 2d 616, this Court comments upon the fact that there are a number of West Virginia decisions sustaining the rule that premeditation and deliberation may be inferred from the intentional use of a deadly weapon and that there are West Virginia cases to the contrary, citing *State* v. *Bowles,* 117 W. Va. 217, 185 S. E. 205, and stating further that the Court did not consider the principle applicable to the case then at bar.

There can be no doubt but that the instruction is phrased in the abstract, as is illustrated by its practically verbatim approval in the *Welch* case. For this reason it probably should not have been given, although since the State's proof establishes circumstances that would justify the application of the principle stated, we do not believe that its abstract statement of that principle could possibly have resulted in prejudice to the accused. It is to be noted also that although the eleventh point of the syllabus in the *Cain* case has been approved by numerous West Virginia holdings, it does not properly state a casual connection between the possession of a deadly weapon and the homicide of which the prisoner is accused. It states that if the accused with a deadly weapon in his possession inflicted a mortal wound, not necessarily with the weapon but in any manner, the presumption arises. It is conceivable that a person armed with a heavy revolver could inflict a mortal wound with long fingernails, in which case it would be plainly bad to base a presumption upon the possession of a weapon.

The plaintiff in error relies upon the case of *State* v. *Dickey,* 46 W. Va. 319, 33 S. E. 231, in which the instruction in question was disapproved because its giving

ignored substantial proof of provocation, not for the reason that it stated an unsound principle. Judge Brannon dissented from the *Dickey* decision, and furthermore, it was based upon a conviction of voluntary manslaughter so that an inapplicable instruction dealing with murder in the first degree obviously did not prejudice the accused. The *Dickey* case was reversed for other reasons as well.

Based upon the foregoing West Virginia cases sustaining the principles stated in the instruction, we are of opinion that its giving in the case at bar did not constitute reversible error.

Perceiving no prejudice to the accused disclosed by the record before us, the judgment of the Circuit Court of Logan County is affirmed.

*Affirmed.*