# CHARLESTON.

## STATE v. GEORGE PRICE.

Submitted November 22, 1922.    Decided December 12, 1922.

1. JURY—*Where Writ of Venire Facias Issued Less Than 30 Days Before Day for Which Jury Summoned, Service Not Subject to Challenge.*

   The statutory requirements respecting the time of issuing writs of *venire facias* for petit jurors are directory, and a jury appearing in obedience to the command of such writ issued less than thirty days before the day upon which the jurors summoned are required to appear for service is not subject to challenge for that reason. (p. 553).

2. SAME—*That Venire Facias Requires 32 Instead of 30, Jurors Summoned, Not Ground for Challenge to Array or Motion to Quash Panel or Writ.*

   Nor will the fact that the *venire facias* requires 32 jurors to be summoned instead of 30, as required by law, be ground for challenging the array or of a motion to quash the panel or writ of *venire facias,* even though it be shown that no order was entered providing for summoning more than the number of jurors provided to be summoned by statute. (p. 553).

3. SAME—*Clerk's Failure to Sign Summons to Jury Commissioners Held Not Ground for Challenge to Array or Motion to Quash Where Jurors Appeared.*

   Nor will the fact that the clerk did not sign the summons to the jury commissioners constitute such ground of challenge or motion to quash where they appeared at the time appointed and performed the duties required of them. (p. 554).

4. HOMICIDE—*State May Prove that Accused Inquired as Probable Movements of Persons Killed.*

   In a prosecution for murder it is competent for the State to prove that immediately before the homicide the defendant made inquiries as to the probable movements of the person, or persons, whom he subsequently killed, indicating a purpose on his part to place himself in such a position that such person or persons, necessarily must encounter him. (p. 554).

5. WITNESSES—*Right to Cross-Examine Limited to Matters Brought Out Upon Examination in Chief.*

   The right of cross-examination of a witness not a party to

the suit is limited to inquiries about facts or circumstances brought out on the examination in chief. If it is desired to examine such witness upon other matters, the party must make him his own witness and introduce him as such in the subsequent progress of the case.  (p. 555).

6.  CRIMINAL LAW—*Not Error to Prevent Witness Answering Questions in Particular Form Where Permitted When Per- Permitted to Answer it in a Different Form.*

It is not error to refuse to permit a witness to answer a question in a particular form, even though the answer thereto is pertinent to the inquiry being conducted, when such witness is permitted to answer the same question in a different form.  (p. 556).

7.  WITNESSES—*Not Error to Refuse to Permit Witness to Answer Immaterial and Irrelevant Questions on Cross-Examination.*

It is not error for the trial court to refuse to permit a witness to answer questions, the answers to which could have no materiality or relevancy to any issue involved.  (p. 556).

8.  HOMICIDE—*Condition of Any One or All of Bodies of Persons Killed by Accused Admissible in Trial for Murder of Them.*

Where it appears that one charged with murder, killed two or more persons at the same time and place, with the same weapon, and in the same encounter, evidence of the condition of any one or all of the bodies, showing the cause or means of death, is admissible against the defendant on trial for the murder of any one of the deceased persons.  (p. 558).

9.  CRIMINAL LAW—*Refusal to Permit Answer Not Ground for Assignment of Error Unless Bill of Exceptions Shows it Material.*

The refusal of the trial court to permit a question to be answered cannot properly be made the basis of an assignment of error, unless it appears from the bill of exceptions that the answer which would have been given to the question is material to the party offering the evidence, and this materiality may be shown by allowing the witness to answer the question in the absence of the jury, or by stating in the record the answer the witness is expected to make.  (p. 558).

10.  SAME—*Where Defense Insanity Not Error to Exclude Self- Serving Declarations; Defendants Conduct Before and After Homicide Tending to Show Deranged Mind May be Shown.*

While it is proper, in a prosecution for murder, where the defense is insanity, to prove the conduct and conversations of

the accused before and after the homicide tending to show the deranged condition of his mind, it is not error to reject the evidence of a declaration made by the accused purely self-serving in its character, and in no way indicating a deranged or disordered intellect.   (p. 560).

11.   HOMICIDE—*Not Material from whom Accused Contracted Disease Alleged to Cause Insanity.*

Upon trial for murder, where the accused seeks to show that he was insane at the time of the homicide as the result of a disease with which he had been afflicted, it is not material from whom or in what manner he contracted such disease, and evidence offered for that purpose is properly rejected. (p. 561).

12.   WITNESSES—*Party May Not Propound Leading Questions to Own Witness.*

In the absence of special circumstances, one introducing a witness has no right to elicit from him the evidence he desires by propounding leading questions, and where the trial court sustains an objection to a question because it is leading, if the party offering the evidence would have the benefit of it, he must reform his question so as to overcome the objection upon that ground.   (p. 558).

13.   CRIMINAL LAW—*Witnesses Acquainted With Defendant May Testify That They Never Observed Anything Indicating Insanity; Witnesses Acquainted with Defendant May Give Opinion as to Insanity Without Detailing Conversations or Conduct.*

Where one charged with crime defends upon the ground of insanity, it is competent for the State in rebuttal to show by persons who were well acquainted with the defendant, and had known him intimately for a considerable time, that they never observed anything indicating that the defendant was insane, and to give their opinions that he was sane, without detailing all of the conversations they had with him or all of his conduct which they observed.   (p. 564).

14.   SAME—*Where Defense Insanity, Competent to Show That Blood Relatives of Accused Were or Had Been Insane.*

Ordinarily, where insanity is relied upon as a defense to crime, it is competent to show that blood relatives of the accused were or had been insane, but before such evidence is admissible the duration and general nature of the insanity of such relatives should be shown, as well as that the ac-

cused exhibited signs of insanity of a more or less permanent nature which might be attributed in some degree to heredity.  (p. 565).

15.    SAME—*Rulings Granting Instructions Not Reversible Unless Excepted to Below and Bill of Exceptions Saved.*

In order that a ruling of the trial court in granting instructions to the jury may properly be made the basis of an assignment of error in this court, it must be excepted to and the exception saved by a proper bill of exceptions.  (p. 565).

16.    SAME—*Refusing Correct Instruction on Matter Covered by Given Instruction Not Error.*

It is not error for the trial court to refuse an instruction correctly propounding a proposition of law applicable to the case, where the party asking it has been granted an instruction requested by him fully covering the matter contained in the one refused.  (p. 566).

17.    HOMICIDE—*Refusing Instruction Excusing Defendant if Acting Under Insane Delusion Not Error Where No Evidence of Such Delusion.*

Upon a trial for murder, where the accused relies upon insanity as a defense, it is not error to refuse instruction to the effect that if the accused acted under the influence of a delusion at the time· he committed the suicide he would not be responsbile if his acts would be innocent in case the facts with respect to which the delusion exists were true, where there is no evidence showing or tending to show any such delusive belief upon the part of the accused.  (p. 567).

18.    WITNESS—*May Be Impeached by Proving Extrajudicial Contrary Statements of Relevant Testimony.*

A witness may be impeached by proving that he has made statements out of court contradictory to testimony given by him upon the witness stand, where such testimony is relevant to the issue.  (p. 568).

19.    SAME—*To Impeach Witness for Extrajudicial Statements They Must be Contradictory to His Testimony; Not Admissible for Impeachment.*

But there must be contradiction; a witness can be impeached by statements made by him out of court only when such statements are contradictory to his testimony. If there is no substantial variance between such statements and his testimony, the statements can not be included for purposes of impeachment.  (p. 572).

20.   SAME—*Contradictory Portion of Extrajudicial Statements to
        Testimony of Witness Admitted, and Portion Not Contradic-
        tory Excluded for Purposes of Impeachment.*

And if his statements are only in part contradictory to his
testimony, the contradictory portion, for purposes of impeach-
ing the witness, should be admitted, and the portion not con-
tradictory should be excluded.   (p. 571).

21.   SAME—*Cannot be Impeached by Proving Extrajudicial State-
        ments Contradictory to Testimony Where Irrelevant and
        Collateral to Issue.*

But a witness can not be impeached by proving that he has
made statements out of court contradictory to testimony given
by him upon the witness stand, where such testimony is
irrelevant and collateral to the issue; and it makes no differ-
ence whether such testimony is given on direct examination
or cross-examination.   (p. 571).

Error to Circuit Court, Wood County.

George Price was convicted of murder, and he brings error.
                        *Reversed and remanded.*

*T. A. Brown* and *C. M. Hanna,* for plaintiff in error.

*E. T. England,* Attorney General, *R. A. Blessing* and *R.
Dennis Steed,* Assistant Attorneys General, *C. N. Matheny*
and *Robert B. McDougle,* for the State.

MEREDITH, JUDGE:

George Price was convicted of the murder of Charles Mc-
Donald and sentenced to be executed, and to review this judg-
ment he prosecutes this writ of error.

The defendant resided in the city of Parkersburg, and had
been until a short time before the occurrences hereinafter
mentioned employed in an industrial plant in that city.
Some six or seven years prior to the murder of McDonald he
was married to a sister of the dead man, and they had lived
together until within two or three months before her death at
his hands.   One child was born to this marriage.   The Mc-
Donald family lived in a suburb of Parkersburg, and after
the defendant's wife ceased to live with him she returned to
the home of her family.   There was also living in the Mc-
Donald family at this time a girl by the name of Maggie

Wigal, whose home was about fifteen miles east of Parkersburg at a little post office named Hanna, but who had employment in an industrial plant in Parkersburg, and staid with the McDonalds when so employed. There was also in the McDonald household another daughter named Rachael, about 18 years of age. On the day before Thanksgiving in the year 1920 Maggie Wigal invited Mrs. Price and her sister Rachael McDonald to go with her to her home in the country to spend Thanksgiving. They accepted this invitation and left Parkersburg on the afternoon of the 24th of November. In order to reach the Wigal home it was necessary to go to Walker's Station one mile beyond Hanna and walk back.

On Thanksgiving morning the deceased, Charles McDonald, together with Lindsay Eddy, Pearl Eddy, Alfred Eddy and Floyd Howley, left Parkersburg over the Little Kanawha Railroad, and got off at a station called Hughes' River. Their purpose was to pass the day in hunting. It appears that the five young men engaged in this pastime until about noon when they crossed the river and had lunch at a store. They then continued hunting until about three o'clock in the afternoon when three of the boys, Charles McDonald, Floyd Howley and Lindsey Eddy, decided that they would go across to Walker's Station and take the Baltimore & Ohio train at that point for Parkersburg, in that way reaching home sooner than they could by the Little Kanawha Railroad, their purpose being to attend a dance on that evening. Accordingly these three young men left their two companions and went toward Walker's Station. They came to the Wigal residence where Mrs. Price and her sister Rachael McDonald and Maggie Wigal were. They spent the remainder of the afternoon there, and just before six o'clock they ate supper and prepared to depart for Walker's Station, it being necessary, as before stated, to walk a mile in order to board the train returning for Parkersburg. The Wigal homestead lies back from the railroad as well as from the county road some little distance, and there is a road leading from this place down to the county road and the railroad at Hanna. There is likewise a path which leads from the Wigal homestead down to the railroad at a point about three hundred yards east of

Hanna where the railroad crosses Walker's Creek, the point of intersection of this path with the railroad being closer to Walker's Station than the post office at Hanna. Parties desiring to go from the Wigal residence might use either of these travelled ways.

On Thanksgiving day the defendant ate dinner with his brother, Doctor Price, at his home in Parkersburg. A short time thereafter he went to the Baltimore & Ohio railroad station with his brother and sister, Mrs. Carney, and there boarded a local passenger train for Walker's Station. When he reached Walker's Station he walked back to the post office at Hanna and there met a man by the name of Frank McDonald who informed him that his wife was then at the Wigal residence. Upon securing this information Price went into the post office, which was conducted in a country store, and purchased a dime's worth of candy, and while completing the purchase inquired of the proprietor of the store how the Wigals came from their residence to take the train at Walker's Station. He was informed that the usual way was to come down the well defined path which intersected the county road and the railroad at Hanna post office, and then follow the railroad to the station, a distance of about one mile, but that there was another path leading from the Wigal residence which intersected the railroad at the point above indicated about 300 yards nearer to Walker's Station than the post office at Hanna. Price claims that he came to Walker's Station on this occasion for the purpose of seeing his brother-in-law, Everett Carney, with a view to obtaining employment. It seems that Carney was at this time engaged in cutting props, and Price says that Carney had promised him employment when he began this work. In order to carry on the work Carney had secured a small house at Hanna in which a man by the name of Backus who had a contract with Carney was living with a number of men who were engaged in the work, and Carney at this time was staying at this house, he not having yet secured permanent quarters at Walker's Station. Shortly before six o'clock Price left the post office at Hanna and walked toward Walker's Station. When he reached the point on the railroad where it is intersected by

the path coming down from the Wigal residence he met Mrs. Beha and her daughter who were coming down this path after having visited the sister of Mrs. Beha, who lived near the Wigal residence. Price accosted them and made inquiry as to how the Wigals would come from their residence in order to go to Walker's Station, and was informed that the usual way would be to come down the road to Hanna post office, and then follow the railroad to Walker's Station, but that they might come down the path which these parties were using, although it was not ordinarily used by the Wigals. Price then inquired whether there was any other way by which they could come to the railroad, and being informed that there was not, inquired what time the train returning to Parkersburg was due, and being informed that it was due about 6:30, made some inquiry as to what time it was then, to which Mrs. Beha replied that she thought it was about six o'clock. Mrs. Beha and her daughter then left Price and went toward their home, about 300 yards from the place at which she met Price. It seems that Price remained at this point until the party coming from Wigals appeared upon the scene.

A little before six o'clock the party at Wigals left the house with the purpose of going to Walker's Station to board the train returning to Parkersburg. This party consisted of Charles McDonald, the deceased, a brother of Mrs. Price and brother-in-law of the defendant George Price, a young man about 21 years of age; Lindsey Eddy, a man about the same age; Floyd Howley, another young man; Mrs. Price who was then 23 years of age; her sister, Rachael McDonald, and Maggie Wigal. These six intended to take the train and return to Parkersburg. They were accompanied from the house to the post office at Hanna by a younger sister of Maggie Wigal, and when they reached that point this younger sister, not intending to go any further with the party, stopped, and Floyd Howley also stopped in order to have some parting conversation with her before leaving. At the post office the party was joined, however, by Herman Wigal, the younger brother of Maggie Wigal, who decided to accompany the party to Walker's Station, although he did not intend

to go to Parkersburg, so that when the party left Hanna and proceeded along the railroad toward Walker's Station it consisted of Charles McDonald and Lindsey Eddy walking together in front, Herman Wigal and Rachael McDonald following, and Maggie Wigal and Ada Price, the wife of the defendant, in the rear. It appears that the young men who had been hunting had shot guns with them at the time, but it is shown that none of them were loaded, and that none of the party had any ammunition with which to load them. Upon crossing the trestle, just before reaching the point at which the path from the Wigal residence intersects the railroad, Eddy and McDonald, walking in front, observed Price standing by the side of the railroad, and one of them spoke to him. It seems that just before entering upon the trestle, Mrs. Price requested one of the young men to assist her in walking across the same, and Herman Wigal had come to her assistance, and at the time they came to where Price was standing they had just passed over the trestle, and Wigal was still supporting her by the arm. According to the evidence of all of the eye-witnesses, except the defendant, when Wigal and Mrs. Price came to where Price was standing he stepped upon the track and presented a Savage automatic pistol in Wigal's face, and demanded to know who he was and what he was doing there with his wife. Wigal says he gave his name and told him that he had simply been helping his wife across the bridge at her request. About this time Charles McDonald and Lindsey Eddy, observing the attitude of Price, returned, and McDonald stepped between Price and Wigal and attempted to explain the situation to Price, whereupon Price presented his pistol in McDonald's face and told him that he knew who he was, and for him to get down the railroad. McDonald shoved the pistol aside with one hand, at the same time, according to the witnesses, holding his gun in his other hand by his side with the butt or stock resting upon the ground, and when Price told him to get down the railroad he replied, "You make me," upon which Price immediately shot him. Upon the first shot being fired, the party scattered, but before McDonald had gotten very far he was shot a second time and dropped dead some 25 or 30

feet from the point where he first encountered Price. Price continued shooting at the various members of the party until he had exhausted the cartridges in the magazine of the pistol. He then reloaded and discharged the pistol several more times at the various members of the party. At the time Price came upon the railroad and accosted Wigal it is shown that with his left hand he grabed his wife by one of her arms and held her. As a result of the shooting McDonald was killed, as before stated, Maggie Wigal was so dangerously wounded that she died a few hours later in a hospital at Parkersburg, and Price's wife received four separate pistol wounds, some, or all, of which proved fatal a short time after the shooting. Rachael McDonald was also shot through one of her arms. The remainder of the party escaped uninjured. Immediately after this shooting Price turned the pistol on himself and inflicted a superficial wound in his chest, the bullet not entering, but being deflected and passing out to one side. He thereupon left the scene of the shooting and returned to Hanna, and went to the house which had been rented by his brother-in-law, Carney, and which was occupied by Backus, Carney, and the other workmen. There is considerable other evidence from various witnesses who were in close proximity to the place of shooting, some of which will hereafter be adverted to in discussing some of the assign-ments of error.

Price's story of the shooting is, of course, somewhat different from that detailed above. He says that when he came to Hanna and learned that his wife was at the Wigals he thought he would try to see her with a view to having a reconciliation, or of at least seeing his child who he thought was with its mother on that occasion, and it was with this view that he went to the point where he intercepted the party. He says that when he stepped up on the railroad and accosted Wigal, who was walking with his wife, and asked him what he was doing with his wife, Wigal replied that he didn't know he had such a thing, that he had taken her away from him several months before, and that just about that time Charles McDonald and Lindsey Eddy appeared upon the scene, and, upon the request of his wife, Charles McDonald

raised his shot gun and fired at him, Wigal about the same time drawing his revolver and shooting him in the breast; that the discharge from the shot gun went wild; that Wigal fired a second shot that went through his hat; that he thereupon pulled his pistol and shot McDonald; that he shot at Wigal a time or two, but that he does not recall whom he shot at next, or the order in which the remaining casualties were inflicted; that he has no further recollection of what transpired until he recovered his senses in the hospital at Parkersburg. When he was taken to the hospital at Parkersburg the wound in his breast was examined and found to be only superficial. The physicians who attended him at the time say that he was then incoherent and irrational. He was indicted, not only for the murder of Charles McDonald, but also for the murder of his wife and Maggie Wigal, and for wounding Rachael McDonald, and trial was had upon the indictment charging him with the murder of his brother-in-law Charles McDonald, resulting, as before stated, in a verdict of murder in the first degree, and a sentence that he be excuted in expiation of the crime.

The defendant was arraigned on the 26th of January, 1921, at which time he demurred and moved to quash the indictment, which demurrer and motion to quash being overruled, he plead not guilty, and the case was set for trial on the 14th of February, 1921. On the 12th of February the defendant filed three motions, one being a motion to quash the entire panel or array of petit jurors, another a motion to quash the *venire facias* which summoned 32 petit jurors to serve at the January term of the court, and the third a motion challenging the entire panel and array of petit jurors who were summoned to attend at that term of court, the grounds of all three of which motions were exactly the same, to-wit, that the *venire facias* for the jury for the January term of the court was issued on the 28th of December commanding the jurors therein named to appear for service on the 25th of January, less than 30 days from the date of the issuance of said *venire facias*; second, that the sheriff's return upon the *venire facias* was insufficient; *third,* because said *venire facias* summoned 32 jurors instead of 30, as provided by law,

there being no order of the court for summoning more than 30 jurors; and fourth, because the summons issued by the clerk of the circuit court requiring the jury commissioners to attend and draw the jury was not signed by said clerk, or any one for him. All of these motions were overruled, and the action of the court in overruling them is made the basis of assignments of error herein.

Does the fact that the *venire facias* was issued less than 30 days before the day upon which the jurors were required to attend invalidate it? It would seem that it would make little difference as to whether or not this requirement of the statute was strictly complied with. The provision that the *venire facias* be issued 30 days before the jurors are required to attend was no doubt primarily for the purpose of giving the sheriff time to have them summoned, and the prospective jurors time to arrange their private affairs so as to perform their public duties with as little inconvenience to themselves as possible. In the case of *State* v. *Clark,* 51 W. Va. 457, 41 S. E. 204, it was held that the statutory requirements respecting the time of issuing writs of *venire facias* for petit jurors and summonses to jury commissioners to draw the jurors are directory. Ordinarily, a statute providing simply a mode of procedure will be held directory, and if the thing intended to be done is done in some other way than that provided by the statute it will be valid, unless the statute in express terms provides that it shall be invalid unless performed in the manner pointed out.

The sheriff's return on the *venire facias* is also challenged as insufficient. It is, "executed Jany. 4, 1921, the within by summonses on the within named to serve as petit jurors at the Jany. term, 1921. W. T. Cochran, S. W. C.—R. K. Petty, Deputy." It is not contended that the jurors drawn by the jury commissioners were not in fact the ones who attended in response to the writ of *venire facias,* so that it is not very material whether or not it was served at all. If the jurors were informed in any way that they were the jurors drawn for service, and appeared in response to such information, they would be just as good jurors as though they had been regularly served. However, there does not seem to be any-

thing wrong with this return of the sheriff. He says that he summoned all of the parties named in the writ, and while he does not specifically name them in his return he does refer to the face of the writ where they are all named.

There is no merit in the contention that the panel of jurors should be quashed because 32 jurors were summoned instead of 30 as required by statute, it not appearing that the court had made any order providing for drawing any jurors in addition to the 30 provided by law. This same question was raised in the case of *State* v. *Medley,* 66 W. Va. 216, 66 S. E. 358. In that case 50 jurors were summoned instead of 30, and this court held that the statute limiting the number of jurors to 30 was more of an economic measure than anything else, and the fact that more than the number provided were drawn and summoned would in nowise invalidate the *venire facias,* or be ground for quashing the panel of jurors.

Does the fact that the clerk failed to sign the summons issued by him to the jury commissioners, requiring them to attend and draw a jury, render their acts invalid? We do not think so. If the jury commissioners attended, the function of the summons was accomplished. Its only function was to bring them in for the purpose of performing their duties. If they appeared at the time appointed and performed the duties required of them, the fact that they were not served with a summons is entirely immaterial. Their acts would be just as valid, if they voluntarily appeared and performed the duties imposed upon them by law, as though they had come in obedience to a summons requiring their attendance.

The defendant assigns as error the action of the court in rejecting certain evidence offered by him, and in refusing to permit witnesses for the state to answer certain questions propounded by him upon cross-examination, and also in admitting certain evidence on behalf of the state which he contends was prejudicial to his interest. The first of these assignments involves the action of the court in permitting the witness Monroe Devaughan, who kept the store at Hanna, to testify that while Price was purchasing a dime's worth of candy he inquired whether there was any place that the Wigal

folks could get on the railroad in going to Walker's Station besides at Hanna post office, to which inquiry the witness replied that there was another path which they might take that intersected the railroad at or near the trestle at a point somewhat nearer to Walker's Station, and which was the point at which the tragedy occurred. We can see no error in admitting this testimony. It was clearly pertinent as tending to prove that Price was seeking an encounter with his wife and her relatives, and it showed, or tended to show, at any rate, that he desired to place himself in a position where they would necessarily meet him in going from the Wigal residence to the railroad station. Further than this, Price admitted the fact when he was on the witness stand, and explained that he desired the information so that he might not be disappointed in meeting his wife on that occasion.

A witness, Homer Price, was introduced by the state who corroborated the witness Devaughan as to the transaction in his store on the occasion of the purchase of the candy by Price, and who also stated that he saw Price after the shooting. The action of the court in refusing to permit this witness to testify on cross-examination where he had gotten acquainted with the defendant's wife is assigned as error. We can see no materiality in this inquiry. It was not cross-examination touching any subject upon which he had testified in chief. It is not suggested in the record what he would have testified had he been permitted to answer the question. It is shown that he was at home in bed at the time of the tragedy. Ordinarily a party has no right to cross-examine a witness not a party litigant except as to facts and circumstances connected with the matters stated in his direct examination. If he desires to examine him on other matters he must do so by making the witness his own and calling him as such in the subsequent progress of the case. If any materiality could by any possibility appear from any answer the witness might have made to this question, in order to have availed himself of it the defendant should have called him to testify when his defense was being presented. *State v. Hatfield,* 48 W. Va. 561, 37 S. E. 626; *State v. Carr,* 65

W. Va. 81, 63 S. E. 766. This same witness was also asked on cross-examination whether or not Price, after the shooting, when he attempted to talk, mumbled his words or spoke distinctly. The only purpose this testimony could have would be to indicate that Price was in an irrational state of mind after the tragedy. This defense had not at that time even been suggested, and what we have said in respect to the last above assignment applies with equal force to this.

The next assignment of error insisted upon by defendant is the refusal of the court to permit the witness Lindsey Eddy to testify on cross-examination as to whether or not Ada Price, the defendant's wife, had told him that she was going out to spend Thanksgiving at the Wigals. It is hard for us to see any materiality that any answer the witness might have made to this question would have. Further than this, the witness was permitted, in answer to the very next question ot state that he did not know that Mrs. Price was going out to the Wigals to spend Thanksgiving. This was an unequivocal answer to the question, and the fact that the court refused to permit the answer to the question in one form when it was answered in a little different form is not error, even though the answer might be considered material. *State* v. *Murphy*, 89 W. Va. 413, 109 S. E. 771.

The action of the court in refusing to permit the witness Lindsey Eddy to testify whether he knew what Herman Wigal went down to Hanna for on the occasion of the homicide is also assigned as error, as well as the action of the court in refusing to allow this witness to testify in regard to Floyd Howley offering Mrs. Price his gun upon being informed that her husband was in the neighborhood. Neither of the matters inquired about were proper cross-examination, and if the defendant considered them material to his defense he should have offered them as evidence in chief when he came to present his case. *State* v. *Hatfield, supra; State* v. *Carr, supra.*

The action of the court in refusing to permit the witness Lindsey Eddy to testify on cross-examination as to what, if anything, he said to a boy by the name of Henthorne whom he met on the railroad as he was fleeing from the place of

the tragedy is likewise assigned as error, the purpose being, as stated by defendant's counsel in their proffer, to show that when Eddy met this boy, he made no statement to him in regard to the transaction which he had just witnessed, from which it might be inferred that he was criminally culpable in connection therewith. If such was the purpose, and if such would be the effect of the answer expected, it was clearly matter of defense, and not cross-examination, and there was no error in refusing to admit it at this stage of the trial.

The action of the court in refusing to permit the witness Herman Wigal on cross-examination to testify that he had left Backus's house before Backus returned to his work that afternoon, and in refusing to allow this witness to testify on cross-examination whether or not he had ever seen the defendant's wife in Parkersburg, and to testify as to whether or not he had ever owned a revolver, is assigned as error. We do not think there is anything in any of these assignments. As to whether or not the witness left Backus's house in the afternoon in question before Backus returned from his work is entirely immaterial so far as we are able to discern, and this is likewise true of any answer that might have been made to the other two inquiries. It is true, Price says, that Wigal shot him with a revolver, but Wigal was cross-examined as to his possession of a revolver or pistol on the occasion of the tragedy, and in answer to this question stated that he did not have a revolver on that occasion, and did not own one at that time. The inquiry as to whether or not he had ever owned one could not be in any sense material, no matter what answer he might have made thereto.

The action of the court in refusing to allow the witness Floyd Howley on cross-examination to answer a question as to what Price had been hounding his wife about is also assigned as error. This question was asked on cross-examination, and followed some other inquiries which had been made by defendant's counsel on cross-examination which were not proper subjects thereof. If the relations between the defendant and his wife were material at all they were matters of defense. They were not gone into by this witness on his

examination in chief, and it was not error for the court to refuse to allow them to be introduced as part of his cross-examination.

The action of the court in refusing to allow the witness Backus to testify on cross-examination as to his contract and arrangements for doing the work in which he was engaged at Hanna is also assigned as error. It is contended that the witness ought to have been allowed to testify in regard to this as corroborating Price's statement as to why he went to Hanna on the day of the tragedy. Assuming that it was proper to inquire of this witness as to any state of facts which would likely constitute a basis for Price's trip to Hanna on the day of the tragedy, the witness was allowed to testify that the work was being carried on at that point, and that Price's brother-in-law was in charge of it. This was all that was at all material in any view of the case. As to just what arrangement existed for the conduct of the work could not be material to any inquiry in this case.

It is also contended that it was error to permit the witness Dr. Casto to testify as to the wounds which had been inflicted upon the defendant's wife. It is insisted that inasmuch as he was on trial for the murder of Charles McDonald it was improper to admit testimony showing the injury inflicted upon anyone else. It is quite well established that where the evidence shows that two or more persons were killed at or about the same time and place, and by the same weapon, and in the same encounter, so that the several crimes form one transaction, evidence of the condition of any one of the bodies showing the cause or means of death as disclosed by an autopsy, or otherwise, is admissible against one on trial for the homicide of any one of the deceased persons. Underhill, Criminal Evidence, Sec. 321.

Mrs. Everett Carney was introduced as a witness on behalf of the defendant, and testified that she had been with the defendant just before he left Parkersburg for Walker's Station, and that he seemed depressed on that occasion. She was asked by counsel for the defendant what he said on the occasion referred to by her, which question she was not permitted to answer. The record does not disclose what answer

she would have made if she had been permitted to answer the question, so that we are unable to tell whether or not the testimony sought to be elicited would have been material. We can not, therefore, consider this assignment of error. *Davis* v. *Laurel River Lumber Co.*, 85 W. Va. 191, 101 S. E. 447; *State* v. *Sixo*, 77 W. Va. 243, 87 S. E. 267.

What we have said in regard to the refusal of the court to allow Mrs. Carney to answer the question propounded to her applies also to the refusal of the court to allow the witness John Martin, Price's attorney, to state what conversation the defendant had with him the day before the tragedy. The record does not disclose what the witness would have said if he had been permitted to answer the question, for which reason we are unable to say whether or not it would have been material to any issue in the case.

. The witness Mrs. Carney, after she had testified, as before stated, that her brother, the defendant, appeared to be in a depressed condition at the time she saw him on the day of the tragedy, just before he left Parkersburg, was asked if she knew what brought about this depressed mental condition, to which question the state interposed an objection, which objection was sustained, and the defendant by his counsel then stated that they expected the witness to answer that it was brought about and caused by the treatment of the defendant and his child by his wife Ada Price. The witness Iva Parsons was also asked a similar question, to which an objection was sustained. In the case of this witness it was shown that she was acquainted with the Prices while they lived together, and it was stated that the witness would say that the defendant was devoted to the child, but that the mother of the child neglected it and did not take care of it, and that this preyed upon the mind of the defendant and affected it. Similar evidence was sought to be introduced by the witness John Price, the father of the defendant. It may be said, in answer to the contention of the defendant that the court erred in refusing to allow these witnesses to answer the questions above indicated, that not one of them gave any evidence indicating that Price was insane. The most they said about it was that he seemed depressed or

worried, but not one of them detailed any circumstances indicating insanity, nor did any one of them express an opinion that he was insane at any time before committing the offense with which he was charged in this case. Further than this, these witnesses were all non-experts, and it is a little difficult to understand how they could be qualified to testify as to what produced the mental condition they observed. But suppose they were competent to testify, and would have testified that the worried or depressed condition of the defendant at the time they observed him came from the causes to which it is attributed in the proffers made, that would have no pertinency to the issues in this case. The defense attempted to be made was insanity, not abnormality. The evidence that the defendant may not have been an entirely normal person would not prove or even tend to prove that he was insane. We think it was not error for the court to reject this testimony. It would simply have brought into the case an issue which could have in no way properly affected the result.

The action of the court in striking out a statement made by Doctor Sayre as to what the defendant said in the hospital where he was being treated after the shooting is assigned as error. Doctor Sayre testified that on this occasion the defendant appeared to be very irrational; that he objected to being undressed so that his wound could be properly treated; that he complained of being wounded in the head when no wound could be found there; and in answer to a question as to what the defendant said as to how he was wounded, he replied that the defendant stated that they shot him (presumably meaning the deceased, McDonald, and the parties accompanying him at the time of the tragedy). The court struck out this answer upon the ground that it was a self-serving declaration. We think this was not error. It is argued by the defendant that when insanity is relied upon as a defense the statements of the defendant made within a reasonable time before or after the commission of the alleged crime are competent evidence tending to show his mental condition, and this is quite true. But where such statements do not have any such tendency it is not error for the court not to permit them to be introduced. Now it can not be said for a minute that this statement of the defendant had

any tendency to prove that he was insane at that time, or at any other time, for he was then presenting the same defense to any charge which might be brought against him that he presented upon the trial of this case. The defense of insanity relied upon does not of itself make all the statements made by the defendant competent to be admitted in evidence as tending to prove his insanity. A purely self-serving declaration such as that attempted to be introduced in connection with this evidence of Doctor Sayre does not in any way tend to show an unbalanced mind, but rather the contrary, and the court very properly excluded the statement as a self-serving declaration.

The action of the court in refusing to permit the witness E. M. Mason to answer whether he had ever heard a conversation between Ada Price and the deceased, Charles McDonald, in which McDonald stated to Mrs. Price, "You ought to have knocked him in the head with a poker," is also insisted upon as error. It is sufficient answer to this assignment to say that the record does not disclose what answer would have been made by the witness, so that we are unable to say whether or not the answer would have been material.

It is insisted that the court erred in refusing to permit Dr. Casto to answer certain questions asked him in regard to the defendant's wife. This witness had testified that he had been the physician for the defendant and his wife ever since the birth of their child. He was then asked if he had ever attended the defendant's wife on any other occasion, and replied that he did; and was then asked when, to which question an objection was interposed, which objection was sustained. The defendant's counsel then stated that they expected to prove by this witness that he had attended the defendant's wife on one occasion for a loathsome disease, and that she had communicated this disease to the defendant, and as a result thereof his mind had been deranged. Upon this statement being made, the court informed counsel that he did not consider, under the statement made by them, that the condition of the defendant's wife was at all material, but that if they could show anything tending to establish that the defendant was mentally unsound he would permit that

to be done; and, notwithstanding they had theretofore stated that they expected to show by the witness that the defendant's mind had become deranged as the result of a disease, and the court advised that he would permit that to be shown, no further attempt was made to show it, and the witness was asked no further questions along the line indicated by the court. This conduct indicates, at least, that the offer was not made in good faith, but only for the purpose of casting opprobrium upon the wife of the defendant. If, as stated by his counsel, the defendant expected to prove by this witness that his mind had become deranged as the result of a disease, it is hard to understand why he did not proceed with the witness and offer that evidence, particularly after the court informed him that he might do so. The only inhibition placed upon him by the ruling of the court was that he could not show his wife's condition at the time indicated, the court being of the opinion that it was entirely immaterial. In this we think the court was correct. It would have brought into the case a collateral issue which could have in no way aided in solving the questions really presented, but might have diverted the attention of the jury from the real issues they were called upon to decide.

The action of the court in refusing to allow the witness Ladeaux to testify in answer to a question as to what plans had been made by himself and the defendant on the day before the shooting is assigned as error. The witness was asked if he and the defendant had planned a hunting trip for Thanksgiving day. The question was objected to as leading, and the court sustained the objection on that ground, and counsel, without changing the form of the question so as to cure this objection, simply made a proffer of what he expected the witness to say. It is not error for the court to sustain an objection to a leading question, even though the answer desired thereto may be pertinent. When this is done, it is the duty of counsel to frame the question so as to overcome the objection and reask it. *State* v. *Taylor*, 57 W. Va. 228, 50 S. E. 247; *Sayre* v. *Woodyard*, 66 W. Va. 288, 66 S. E. 320.

It is insisted that the court erred in refusing to allow the

defendant to describe the treatment of himself and his child by his wife shortly before she left him. As before stated, his wife had left him some two or three months before the homicide. Counsel for the defendant stated that they expected to show by the witness, in answer to this question, that on an occasion, shortly before his wife left him, he returned unexpectedly from work and found her in a compromising position with another man; and that on other occasions his wife was in the habit of going out at night and leaving their infant child locked up in the house where the defendant would find her when he returned; and that after she did leave him, by making false promises to return the child to him, she procured its custody and then refused to return it. This evidence, it is insisted, would have some bearing upon the defendant's mental condition at the time of the homicide. The court advised counsel that he would allow them to introduce any evidence which showed, or tended to show, the defendant's mental condition at the time of the homicide, or before or after, but that he did not think this evidence had any such tendency, and with this conclusion we quite agree. Of course, if the defendant had killed his wife at the time of the transaction to which he referred, the provocation occasioned thereby might to some extent have palliated the crime, or even excused it, but it could not have this effect when the homicide was committed several months thereafter. It could not in any way tend to prove that the defendant was insane because there is in this instance no suggestion that he was mentally unbalanced at any time, or to any extent prior to the commission of the homicide. To have admitted this evidence would simply have introduced into the case another issue, with the result that the jury's attention would have been more or less distracted from the main question presented for decision.

It is also insisted that the court erred in refusing to permit the defendant to testify that there had been some robberies committed in the community in which he lived about the time he purchased the revolver with which he did the shooting. This evidence was entirely immaterial, and if, as contended, it tended to show that the defendant purchased

the revolved to protect himself against burglars, it is flatly contradicted by the defendant's own statements to the effect that he had carried a pistol ever since he was a boy. However, as before stated, it could make no difference why he purchased the revolver. The material fact was that he had the revolver and used it on the occasion of the homicide, whatever may have been his original purpose in acquiring it.

In rebuttal the state offered a number of witnesses who were well acquainted with Price, and had been more or less intimate with him for some time prior to the shooting, who testified that they observed nothing in his actions or conversation which indicated that he was insane. It is contended that it was error to permit these witnesses to express this opinion without detailing to the jury the facts upon which they based it, that is, that they should be required to tell the jury all of the conversations they had had, and all of the conduct they had observed upon which they based the opinion. When a witness gives an opinion that a particular individual is insane, then it is ordinarily necessary and proper to have him detail the conduct which he has observed and the conversations which he has had with the alleged insane party upon which he bases his conclusion, but this could not very well be the rule when the opinion of the witness is to the contrary. When the question of the mental capacity of one is involved opinions of non-expert witnesses who are well acquainted with him are competent. These opinions are based upon conduct contrary to that ordinarily attributable to one possessed of his faculties under similar circumstances, and not upon conduct which is attributable to sane persons. If the witness had observed conduct and heard conversations from the alleged insane party inconsistent with conduct ordinarily attributable to persons of sound mind, he is allowed to say that he believed that the party was insane, and give that as his reason. If, on the other hand, he has been well acquainted with the subject of the inquiry, and has observed no conduct which would indicate a deranged mind, he is permitted to testify to that effect. That was the holding of this court in the case of *State* v. *Maier*, 36 W. Va. 757, 15 S. E. 991.

The action of the court in refusing to allow the witness S. W. Cain to testify that an aunt of the defendant, and an aunt of his mother were insane, and had been confined in the insane asylum, is assigned as error.   Ordinarily it is competent, where an attempt is made to prove that one is insane, to offer evidence of the insanity of his blood relatives, but to make such evidence pertinent there should be some showing of the nature and duration of the insanity of such relative or relatives, and there should also first be introduced some evidence tending in a substantial degree to prove that the person about whom the inquiry is being made is afflicted with insanity of an hereditary nature.   In this case no effort was made to show the nature of the insanity of the defendant's relatives, its duration, or that it was of that character that might ordinarily be considered hereditary, nor is there any evidence to show that the defendant exhibited any signs of such insanity as that with which his relatives were efflicted. In fact, the only suggestion of insanity upon the part of the defendant is that it came from his mistreatment by his wife, and not from any hereditary tendency, and there is not the slightest proof in this case that the defendant ever exhibited any tendency to insanity until after the homicide, and then the only evidence thereof was his irrational or deranged condition, which could very well be attributed to the reaction which would ordinarily be expected to follow the perpetration of such a crime.   There is no attempt to show that since he rallied from that condition he has been insane or deranged, nor is there any evidence tending in the slightest degree to show any derangement prior to the commission of the crime.   In this state of the case it was not error to reject the evidence of the insanity of his aunt and great-aunt. *State* v. *Maier, supra.*

The action of the court in giving to the jury fourteen instructions on motion of the State is assigned as error.   It appears from the bill of exceptions signed by the judge of the circuit court that the defendant objected to the giving of some of these instructions, but did not except to the ruling of the court in overruling his objection, the bill of exceptions affirmatively showing this fact.   Upon this state of

the record, can we consider the assignment of error involving these instructions? It has been repeatedly held by this court that a ruling of the lower court to which no exception is taken will not be noticed here. *Maxwell* v. *Kent,* 49 W. Va. 542, 39 S. E. 174; *State* v. *Harr,* 38 W. Va. 58, 17 S. E. 794. On account, however, of the character of this case, as well as the necessity for reviewing the State's instructions in passing upon the propriety of the defendant's instructions which were offered and refused, we have carefully reviewed all of the instructions given on behalf of the State. Some of them, it is true, propound abstract propositions of law, and while it might have been better to have made a concrete application of such propositions to the instant case, all of the propositions offered appear to be pertinent, and there was no reversible error in giving them to the jury.

The action of the court in refusing to give a number of instructions offered by the defendant is also insisted upon as error. The defendant requested 39 instructions, of which the court gave to the jury 16, and rejected 23. The first instruction offered is mandatory in form, requiring the jury to find the defendant not guilty. The propriety of the court's ruling in regard to this instruction is manifest from the statement we have heretofore given of the facts attending the homicide.

Instruction No. 3, rejected, is to the effect that if the jury believed that the defendant was so insane at the time of committing the homicide complained of that he was incapable of performing an act with criminal intent, they should find him not guilty. This instruction is fully covered by instruction No. 2 given on behalf of the defendant, and it was not error to refuse to give the proposition of law to the jury a second time.

Instructions Nos. 4, 5, 6, 19, 20 and 22 are to the effect that if the jury believed that the defendant acted under the influence of an insane delusion at the time he committed the homicide, he is not responsible, if his act would be innocent in case the facts with respect to which the delusion exists were true. These instructions may correctly propound an abstract proposition of law, but it is without any application

to this case. There is not the slightest evidence here of any insane delusion upon the part of the. defendant. He insists that he acted in self-defense, and attempts to make out this ˙˙ఒfense by his own evidence and the evidence of his brother-in-law Carney, aided by some other evidence, that some mem-- bers of his wife's family had made threats against him. No attempt is made to show that he was under any belief that there was a conspiracy to take his life by his wife's relatives or anyone else, and if the court had given these instructions, or any one of them, to the jury, no doubt they would have been puzzled to know what facts in the case the court intended them to have application to.

Instruction No. 12, refused, is on the presumption of innocence, and is fully covered by one given.

Instruction No. 13 is to the effect that mere probabilities are not sufficient to warrant a conviction, that the proof must be beyond reasonable doubt. It is fully covered by the instructions given, as is likewise Nos. 15, 16 and 17.

No. 18 is to the same effect as No. 3 above commented upon, and is to the effect that if the accused was so insane as to be incapable of entertaining a criminal intent, he could not be guilty. It is fully covered by instruction No. 2.

Instructions Nos. 23 and 27, refused, are on the question of reasonable doubt, and are fully covered by the instructions. given.

Instruction No. 30 is a definition of the crime of involuntary manslaughter, and was properly refused, as ̍ there is no evidence in the case upon which it could be based.

Instructions 32 and 33 are on the question. of. reasonable. doubt and. presumption of innocence, and are fully covered! by instructions given.

Instruction No. 35 tells the jury that in order to convict they must believe beyond a reasonable doubt that the defendant had a specific intent to kill the deceased. This does not state the law correctly. The specific intent to kill need not be directed against the person actually killed. Instruction No. 37 is subject to the same criticism.

Instruction 36, refused, is upon the question of the *quantum*

of evidence required to convict, and is fully covered by instructions given. The same is true of instruction No. 38.

On his motion in arrest of judgment the defendant filed the affidavits of four witnesses to the effect that one of the jurors, George S. Arnold, stated in a barber shop, prior to the trial of the case, that if he got on the petit jury to try George Price he would hang him, or that he ought to be hanged, or words to that effect, and insisted that because of the prejudice of this juror, as shown by these affidavits, the verdict should be set aside, and a new trial granted him. It was shown upon the hearing of the motion that this juror had answered on his *voir dire* that he had no prejudice or bias in the case; that he had neither made up nor expressed an opinion; and that he could give the defendant a fair and impartial trial. In addition to this there is an affidavit filed by George S. Arnold in which he says that he never made any such statement, either in the barber shop or at any other time or place; and the affidavits of a large number of reputable citizens of Wood county are filed to the effect that juror Arnold is a man of high character and standing, and of first-class reputation for truth and veracity. Upon this showing the court declined to disturb the verdict for that reason. Trial courts must of necessity be allowed large discretion in the matter of setting aside verdicts upon such grounds as this, and unless there has been a clear abuse of discretion this court will not reverse the judgment for that reason. *State* v. *Greer*, 22 W. Va. 800, 820; *State* v. *Baker*, 33 W. Va. 319, 326, 10 S. E. 639; *State* v. *Hobbs*, 37 W. Va. 812, 17 S. E. 380. We do not think the court below abused its discretion in refusing the motion upon this ground. The evidence offered on the motion tending to show prejudice is fully overcome by that offered by the State in opposition.

Defendant complains of the action of the trial court in permitting two of the state's witnesses, Backus and Collins, to testify that after the tragedy, Everett Carney, one of defendant's witnesses, at the home of Carney, a quarter of a mile from the scene of the homicide, in the absence of the defendant, stated to Backus and Collins: ''Come and go up to the bridge right quick. George Price is up there and has

shot some of them people all up and has his wife down on her knees begging for mercy.'' This statement was ostensibly introduced by the state to impeach Carney's credibility. It is insisted by defendant's counsel that this was impeachment in regard to a collateral matter, and therefore, error. To determine whether or not this evidence was proper it is necessary to examine Carney's testimony in chief. He is defendant's brother-in-law, and at the time the shooting started was driving a four-horse team with a load of feed on the county road about half a mile east of Hanna to take it to a point on a hill back of Walker's Station. His hired man, Marshall, was riding Carney's mare in the rear of the wagon, so that Carney could ride her that night back to Hanna where he lived in a shanty. When the shooting started he was a quarter of a mile away; he says the first shot, from its report, was from a shot-gun, thus tending to sustain defendant's theory of self-defense; witness stopped his team; started it again and the shooting began again; he called to Marshall, had him ride up near the wagon, get off the mare, Carney got on and started toward the scene of the shooting. He rode down the county road, crossed the creek, up through the bottom to the railroad track and down the railroad some thirty or forty feet, where he met Rachael McDonald and Maggie Wigal. It was dark and they mistook him for Dr. Conley. They asked him for help, and clung on to his gum boots. Then follow these questions and answers: ''Q. Now, did you see anybody else there, or did anybody else come there? A. Mr. Eddy, I forget his first name. Q. Lindsey Eddy? A. Lindsey Eddy came running up the bank as if he had come from the creek and he was running as hard as he could, and climbed up the bank, and said Charlie is lying over there shot, on the railroad track. Q. Where did Mr. Eddy come from? A. He came up over the grade of the railroad, from the creek bank. Q. What was the condition of the land along there—was the railroad there up higher? A. It was. Q. What is called a fill along the railroad? A. It is a fill along there. Q. How much of a fill? A. Five or six feet; probably seven. Q. What was the nature of the ground at the bottom of the fill? A. It

led off into a little bottom toward the creek. Q. Now, on which side of the bottom did Eddy appear from—was it the north side, or the south side? A. Well, at that particular place it would be on the west side, as the railroad runs north and south at that point. Q. Was it cleared land along there? A. It was. Q. What did Eddy have in his hands, if anything? A. I didn't see him have anything. Q. Where did he go after he came up where you were? A. I couldn't say. Q. Well, what did you do after Eddy came up there? A. I told him to (interrupted by objection of State's counsel and told by defendant's counsel not to tell what witness told Eddy). Q. What did you do and where did you go and how long did you stay there? A. I stayed there until I could get the women released from my boot-legs and I went back for help. Q. Where did you go? A. I went to the cabin, or to the shanty, of John Backus, or my shanty, rather.'' He tells how he went; stopped on the way and helped Marshall over the creek. ''Q. What did you do when you got back to the shanty, and whom did you see there? A. I hollered to John Backus and he came to the door and asked me what I wanted, and I told him some people were shot over on the railroad, and wanted him and some of the men to come over and help take care of them.''

On cross-examination, over objection, he was asked:— ''Isn't it true that this is the statement you made, in substance to Mr. Backus: Come and go up to the bridge right quick, George Price is up there and has shot some of them people all up and has his wife down on her knees begging for mercy?'' He denied making such statement. In rebuttal, Backus and Collins testified he did make it.

The State did not ask him whether he saw George Price when he met the two girls nor while he was there, but it claims that his answer to the first question—''Now, did you see anybody else there, or did anybody else come there?'' when he said ''Mr. Eddy, I forget his first name'' was in effect a denial that he saw George Price there. We do not think so. The question is double—there are two questions in one—''Did you see anybody else there?'' or, ''Did any-

body else come there?'' He answered the second and ignored the first. This is clearly apparent from the examination that followed. Thereafter his attention was not directed to the first question by counsel for defendant or the State. It was the natural thing for him to answer just as he did. We can not say he evaded the first question,—it escaped his attention and the attention of counsel. But if he had purposely failed to answer the first question, and counsel for either party desired an answer it was their duty to press for an answer by repeating the question in some form. This was not done. If his answer to the question was not a denial that he saw George Price there then there is no contradiction between his answer and the statement it is claimed he made to Backus and Collins. ''In order that a witness' alleged variant statement may be admissible to impeach him, there must in fact be some variance between the witness' present testimony and such statement. Where an alleged variant statement is not in any substantial way inconsistent with the testimony sought to be contradicted, it is proper to forbid a party to cross-examine a witness with respect thereto, and to disallow proof of such statement.'' 7 Ency. Ev. page 92, and authorities there cited; 1 Wharton, Evidence, Sec. 559. As we interpret witness' answer, he neither affirmed nor denied that he saw George Price there; hence there was no variance between his answer and his statement, whatever it was, to Backus and Collins. But suppose it is a denial that he saw George Price there, it goes no further than that, hence only such portion of his statement to Backus and Collins as contradicts that could be admitted. ''Where a witness' statement is only in part variant from his present testimony it is proper to admit merely the variant portions and exclude the portions that were not variant.'' 7 Ency. Ev. page 92; *People* v. *Lambert,* 120 Cal. 170, 52 Pac. 307.

But counsel for the State attempt to justify the admission of the testimony of Backus and Collins on the ground that what Carney testified he said to them was brought out on his examination in chief; that because it was made on direct examination, he might be cross-examined and impeached

thereon, though it be collateral, and they cite *State* v. *Goodwin,* 32 W. Va. 181, 9 S. E. 85; *State* v. *Koch,* 75 W. Va. 648, 84 S. E. 510; and *Commonwealth* v. *Forde,* 16 Gratt. (Va.) 547; in support of this proposition. We have carefully examined these cases. There are statements in the Goodwin and Koch cases to the effect that a witness may be impeached as to a matter, though collateral, if the statement be made in chief, but they are mere dicta and were unnecessary to the decision in those cases. In *Commonwealth* v. *Forde, supra,* this statement is carried into point 2 of the syllabus, but after a careful study of that case, we are of opinion that the matters upon which impeachment was sought were relevant and material and not collateral. The court there says: ''In this point of view the statement becomes incorporated with the main narrative of events, and is an essential part of his testimony.'' Judges Daniel and Robertson stated they did not think it important whether the statement of the witness came out on his examination in chief or on his cross-examination, evidently considering the statement relevant; Judge Moncure stated he thought it relevant. It is quite different in the present case. Carney's statement to Backus and Collins, whatever it may have been, was collateral. The rule laid down in the Forde case is too broad and not warranted by the facts as stated in the opinion. We think the correct rule is that testimony as to collateral matters can not, whether given on direct examination or cross-examination, be contradicted for the purpose of impeaching the witness' credibility. This is supported by the great weight of authority. As directly in point, see: *Blakey* v. *Blakey,* 33 Ala. 611; *Lambert* v. *Hamlin,* 73 N. H. 138; *Atty. Gen.* v. *Hitchcock,* 1 Exch. 91; *Com.* v. *Fitzgerald,* 2 Allen (Mass.) 297; *Ehrman* v. *Whelan,* (Miss.) 40 Sou. 430; *Bullock* v. *State,* 65 N. J. L. 557, 47 Atl. 62; *State* v. *Hendrick,* 70 N. J. L. 41, 56 Atl. 247; *Com.* v *Buzzell,* 33 Mass. 153; *Saylor* v. *Com.,* (Ky.) 33 Sou. 185; 2 Wigmore, Evidence, Sec. 1007; 5 Jones, Commentaries on Evidence, Sec. 827; 1 Greenleaf, Evidence, (16th ed.) Sec. 461e. The case of *Sisler* v. *Shaffer,* 43 W. Va. 769, 28 S. E. 721, cited by counsel for the State, where the court

said: "A party to a suit who testifies in his own behalf to a fact irrelevant to the issue in support of his own testimony, and prejudicial to his opponent, can not object to its contradiction on the ground of irrelevancy" is not in point Carney's statement to Backus and Collins, as brought out on his examination in chief, was not only irrelevant and collateral, but was in no sense prejudicial to the State. The State was not so much interested in showing by Carney that Price was at the scene when Carney met the two girls; but what it desired to get before the jury was the highly damaging statement that Price had his wife down on her knees begging for mercy. That fact it sought to prove by its own eyewitnesses, but a statement of Maggie Wigal to Rachael McDonald to that effect was properly ruled out as hearsay. The State, in this indirect way, sought to show what it could not show by any of those who actually saw the shooting. From what we have said, it necessarily follows that the testimony of Backus and Collins should not have been admitted either to contradict Carney's answer to the question "Now, did you see anybody else there", because Carney did not answer the question, hence there was no contradiction between his statement and his answer to the question; or to contradict his testimony on direct examination as to what he said to Backus and Collins, because what he said to them was wholly irrelevant and collateral. The admission of the contradictory evidence of Backus and Collins was exceedingly prejudicial to the defendant and was error.

For this reason the judgment will be reversed, the verdict set aside, and the case remanded for a new trial.

*Reversed and remanded.*